SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| ROBERT BAKER, on behalf of himself and all those entitled to recover for the death of TARA BAKER, | ) Arizona Supreme Court ) No. CV-12-0102-PR ) ) |
| Plaintiff/Appellant, | ) Court of Appeals ) Division Two ) No. 2 CA-CV 11-0080 ) |
| v. | ) ) Pima County ) Superior Court |
| UNIVERSITY PHYSICIANS HEALTHCARE, an Arizona corporation; BRENDA J. WITTMAN, M.D. and JOHN DOE WITTMAN, wife and husband; ARIZONA BOARD OF REGENTS doing business as UNIVERSITY OF ARIZONA COLLEGE OF MEDICINE, | ) No. C20097222 ) ) ) ) ) **O P I N I O N** ) ) ) |
| Defendants/Appellees. | ) ) ) |

Appeal from the Superior Court in Pima County
The Honorable Richard E. Gordon, Judge

**VACATED AND REMANDED**

Opinion of the Court of Appeals, Division Two
228 Ariz. 587, 269 P.2d 1211 (2011)

**VACATED IN PART**

LAW OFFICE OF JOJENE MILLS, P.C.                               Tucson
     By   JoJene E. Mills
Attorney for Robert Baker

CAMPBELL, YOST, CLARE & NORELL, P.C.                         Phoenix
     By   Stephen C. Yost
          Kenneth W. McCain
Attorneys for University Physicians Healthcare, Brenda J.
Wittman, Arizona Board of Regents, and University of Arizona
College of Medicine

HARALSON, MILLER, PITT, FELDMAN & MCANALLY P.L.C.          Tucson
     By   Stanley G. Feldman

And

KNAPP & ROBERTS, P.C.                                   Scottsdale
     By   David L. Abney
Attorneys for Amici Curiae Arizona Association for Justice/
Arizona Trial Lawyers Association

HARALSON, MILLER, PITT, FELDMAN & MCANALLY P.L.C.         Phoenix
     By   Nathan J. Fidel
Attorney for Amici Curiae Steven Hardy and Mary Louise Hardy

JONES, SKELTON & HOCHULI, P.L.C.                         Phoenix
     By   Eileen Dennis GilBride
Attorney for Amicus Curiae Mutual Insurance Company
of Arizona

SNELL & WILMER L.L.P.                                     Phoenix
     By   Barry D. Halpern
          Sara J. Agne
Attorneys for Amicus Curiae Arizona Medical Association
_____

**B A L E S**, Vice Chief Justice

**¶1**     This case concerns the interpretation and constitutionality of A.R.S. § 12-2604, which sets requirements for experts who testify about the appropriate standard of care in medical malpractice actions.

**I.**

**¶2**     Seventeen-year-old Tara Baker was treated for blood clots by Dr. Brenda Wittman, an employee of University Physicians Healthcare and the Arizona Board of Regents.  Ms. Baker later died and her father, Mr. Robert Baker, brought this wrongful-death action alleging medical malpractice against Dr.

2

Wittman, her spouse, and her employers (collectively "UPH").

¶3        Dr. Wittman is certified by the American Board of Pediatrics in pediatrics and in pediatric hematology-oncology. The American Board of Medical Specialties ("ABMS") recognizes pediatrics as a specialty and pediatric hematology-oncology as a subspecialty of pediatrics.  To testify about the standard of care owed to Ms. Baker by Dr. Wittman, Mr. Baker disclosed Dr. Robert Brouillard as his expert.  Dr. Brouillard is certified by the American Board of Internal Medicine in internal medicine and in hematology and medical oncology.  The ABMS recognizes internal medicine as a specialty and hematology and medical oncology as subspecialties of internal medicine.

¶4        UPH moved for summary judgment, arguing that Dr. Brouillard was not a qualified expert under § 12-2604.  The statute provides in part:

> A.    In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and the person meets the following criteria:
>
> 1.   If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered.  If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.

3

2. During the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to either or both of the following:

(a) The active clinical practice of the same health profession as the defendant and, if the defendant is or claims to be a specialist, in the same specialty or claimed specialty.

(b) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant and, if the defendant is or claims to be a specialist, in an accredited health professional school or accredited residency or clinical research program in the same specialty or claimed specialty.

A.R.S. § 12-2604(A)(1)-(2).

¶5 The trial court granted UPH's motion for summary judgment. Determining that the relevant specialty was pediatric hematology, the trial court ruled that Dr. Brouillard was not a qualified expert because he, unlike Dr. Wittman, was not certified in that specialty. (Although the attorneys and the trial court referred to "pediatric hematology," the correct term is "pediatric hematology-oncology.") The court also rejected Mr. Baker's constitutional challenges to the statute.

¶6 The court of appeals agreed that Dr. Brouillard was not qualified but reversed the trial court's decision in part. It ruled that the word "specialty" in § 12-2604 refers to one of the twenty-four specialty boards that make up the ABMS, rather than subspecialties such as pediatric hematology-oncology.

4

*Baker v. Univ. Physicians Healthcare*, 228 Ariz. 587, 590–91 ¶¶ 8, 13, 269 P.3d 1211, 1214–15 (App. 2012). The court declined to follow *Awsienko v. Cohen*, in which another appellate panel suggested that "specialty" includes ABMS subspecialties. 227 Ariz. 256, 258, 260 ¶¶ 9, 17–18, 257 P.3d 175, 177, 179 (App. 2011). Under the definition adopted by the court of appeals here, Dr. Brouillard was not qualified as an expert because he was not board certified in pediatrics, the ABMS specialty in which Dr. Wittman was board certified. *Baker*, 228 Ariz. at 591 ¶ 11, 269 P.3d at 1215. Remanding, the court of appeals instructed the trial court to give Mr. Baker time to find another expert who is board certified in pediatrics. *Id.* at 593 ¶ 25, 269 P.3d at 1217.

¶7 We granted review to address issues of statewide importance regarding the application of § 12-2604. We have jurisdiction under Article 6, Section 5(3) of Arizona's Constitution and A.R.S. § 12-120.24.

## II.

¶8 We interpret statutes to give effect to the legislature's intent, looking first to the statutory language itself. *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993). When the language is clear and unambiguous, and thus subject to only one reasonable meaning, we apply the language without using other means of statutory construction. *State v.*

5

*Gomez*, 212 Ariz. 55, 57 ¶ 11, 127 P.3d 873, 875 (2006). If, however, the language is ambiguous, "'we consider the statute's context; its . . . subject matter, and historical background; its effects and consequences; and its spirit and purpose.'" *Id.* (quoting *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994)).

¶9    The general intent of § 12-2604 is clear: in a medical malpractice action, only physicians with comparable training and experience may provide expert testimony regarding whether the treating physician provided appropriate care. The statute, however, is ambiguous regarding its application to particular cases. If a treating physician is or claims to be a board-certified specialist, the statute provides that a testifying expert must be board certified in the same specialty. A.R.S. § 12-2604(A). But the statute does not define the terms "specialist" or "board certified," and Arizona law does not otherwise provide general definitions for these terms. A physician need not be considered a specialist in order to practice in a certain area of medicine, and physicians who specialize may provide medical treatment outside their specialty. Moreover, different specialists may be prepared by training and experience to treat the same medical issue for a particular patient. Finally, physicians may hold multiple certifications from different certifying bodies.

6

¶10     Applying § 12-2604 requires us to interpret its terms in a way that comports with the legislature's intent and provides guidance to those affected by its provisions. We first consider the statute's application to testimony about the "appropriate standard" of care and then consider the meaning of the terms specialist, specialty, and board certified.

**A.**

¶11     The statute sets qualifications for witnesses who may provide "expert testimony on the *appropriate standard of practice or care*." A.R.S. § 12-2604(A) (emphasis added). This language informs our interpretation of the other statutory provisions specifying qualifications for expert witnesses.

¶12     In medical malpractice cases, plaintiffs must show that a health care provider breached the appropriate standard of care and the breach resulted in injury. *Id*. § 12-563. The standard of care, however, necessarily depends on the particular care or treatment at issue. *See id.* § 12-563(1) (describing the standard of care broadly, as "that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances"). Thus, only if the care or treatment involved a medical specialty will expertise in that specialty be relevant to the standard of care in a particular case.

¶13 With regard to treating physicians who are or claim to be specialists, § 12-2604(A)(1) requires testifying experts to "specialize[] . . . in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered." This requirement, however, presumes that the care or treatment at issue was within the specialty of the treating physician. If a treating physician practices outside his or her specialty, the statute does not require a testifying expert to possess qualifications in an irrelevant medical specialty, nor would any such requirement make sense. *See Baker*, 228 Ariz. at 594 ¶ 28, 269 P.3d at 1218 (Eckerstrom, J., concurring) ("[E]xpert witnesses need not mirror those specialties of the defendant physician that are not pertinent to the relevant injury or procedure."); *Woodard v. Custer*, 719 N.W.2d 842, 849-50 (Mich. 2006) (reasoning that a statute similar to § 12-2604 should not be read to require irrelevant specialties and board certifications); *cf. Taylor v. DiRico*, 124 Ariz. 513, 518-19, 606 P.2d 3, 8-9 (1980) (recognizing that common law does not require expertise irrelevant to standard of care and holding trial court did not err in permitting an internist to testify against a surgeon with respect to "standard of care in the overall treatment of the patient before and after surgery").

¶14 We accordingly interpret § 12-2604(A) as requiring that a testifying expert specialize "in the same specialty or

8

claimed specialty" as the treating physician only when the care or treatment at issue was within that specialty.

**B.**

¶15     We next turn to the meaning of "specialty" and "specialist" for purposes of § 12-2604.  In this regard, medical and general dictionary definitions provide some limited guidance.  *Cf. State v. Jones*, 188 Ariz. 388, 392, 937 P.2d 310, 314 (1997) (relying on dictionaries to identify ordinary meaning of statutory words).  *Dorland's Illustrated Medical Dictionary*, for example, defines "specialist" as "a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice" and "specialty" as "the field of practice of a specialist."  *Dorland's Illustrated Medical Dictionary* 1767 (31st ed. 2007).  Similarly, *The American Heritage Dictionary* defines "specialist" as "[a] physician whose practice is limited to a particular branch of medicine or surgery, especially one who is certified by a board of physicians: *a specialist in oncology*."  *The American Heritage Dictionary of the English Language* 1681 (5th ed. 2011).  It defines "specialty" as "[a] branch of medicine or surgery, such as cardiology or neurosurgery, in which a physician specializes; the field or practice of a specialist."  *Id.*

**¶16** Dictionary definitions, however, do not resolve the issues before us. Also relevant are the other provisions of § 12-2604. The statute requires a testifying expert to have spent a majority of his or her professional time practicing or teaching in the specialty or claimed specialty during the year preceding the occurrence. A.R.S. § 12-2604(A)(2). Because the statute seeks to ensure that testifying experts have experience and training comparable to the treating physician, this requirement suggests that in order for the treating physician to be a specialist, he or she must have similarly spent a majority of his or her professional time practicing or teaching in the claimed specialty.

**¶17** Concluding that a "specialist" is someone who devotes most of his or her professional time to a particular "specialty" still, however, leaves us with the challenge of defining the term "specialty." The statute refers both to "claimed specialty" and physicians who "claim[] to be a specialist." *Id.* § 12-2604. But the statute does not suggest that the legislature intended the meaning of "specialty" to turn on how a treating physician might describe his or her own particular practice. Instead, the statute is more reasonably interpreted as contemplating that "specialty" has a more general, objectively determinable meaning. In other words, a physician might "claim" to be a specialist, but the statute does not mean

10

that a "specialty" is whatever the treating physician claims.

¶18     The court of appeals concluded that "specialty" refers to an area of practice occupied by one of the twenty-four ABMS member boards, such as pediatrics.  Defining "specialty" by referring to areas in which physicians can obtain certification is a reasonable approach because § 12-2604 itself recognizes that physicians may become board certified in particular specialties.  *See id*. § 12-2604(A)(1) (referencing "a specialist who is board certified").

¶19     Board certification is a voluntary process typically administered by organizations such as national specialty boards. *See* John J. Smith, *Legal Implications of Specialty Board Certification*, 17 J. Legal Med. 73, 73-76 (1996); 1 Dan J. Tennenhouse, 1 *Attorneys Medical Deskbook 4th* § 7:4, at 7-6 (2006).  Certification requires graduation from an accredited medical school, successful completion of residency or other training, a certification exam, and, frequently, continuing education and practice requirements.  Smith, *supra*, at 74.

¶20     Although a physician can practice general and specialty medicine without board certification, obtaining certification may confer certain advantages such as hospital privileges, lower malpractice insurance rates, and higher salaries.  Smith, *supra*, at 77.  Most medical school graduates in the United States participate in residency training and then

11

seek board certification.  *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 708 (2011); Smith, *supra*, at 73–74; *see also* American Board of Medical Specialties, *Better Patient Care is Built on Higher Standards* (2012) http://www.abms.org/About_ABMS/pdf/ABMS_Corp_Brochure.pdf (representing that ABMS member boards have certified approximately 80–85% of all U.S. licensed physicians).

**¶21**    Defining "specialty" by reference to practice areas in which a physician may obtain board certification is a workable approach because these areas are objectively identifiable and reflect recognition by certifying bodies that certain practice areas involve distinct training and experience.  *See* Thomas B. Ferguson, *Introduction* to *Legal Aspects of Certification and Accreditation*, at ix–x (Donald G. Langsley ed. 1983) (describing the creation of the certification process as the "final step" following the specialization of medicine and the rise of accredited specialty training programs).  We construe "specialty" for purposes of § 12–2604 as referring to a limited area of medicine in which a physician is or may become board certified.  *See Woodard*, 719 N.W.2d at 851 (interpreting a statute similar to § 12–2604 as "mak[ing] it clear that a physician can be a specialist who is not board certified" and "that a 'specialist' is somebody who can potentially become board certified").

12

¶22 We disagree, however, with the court of appeals' conclusion that § 12-2604 defines "specialty" solely with regard to the areas of medicine occupied by the twenty-four ABMS member boards and does not include subspecialties. *See Baker*, 228 Ariz. at 590 ¶ 8, 269 P.3d at 1214. The court of appeals relied upon Arizona insurance statutes that do not refer to the ABMS or its constituent boards. *See id.* at ¶ 7 (citing A.R.S. §§ 20-841.04(F), 20-1057.01(E), 20-2532(A)(2), 20-2538(B)); *see also* A.R.S. § 20-1057.01(E) (referencing "*a* specialty discipline that is recognized by *an* American medical specialty board" (emphasis added)).

¶23 By its terms, § 12-2604 does not confine the word "specialty" to only the twenty-four ABMS member boards. As commonly understood, a "subspecialty" is a more focused area of practice encompassed by a broader specialty, but the subspecialty is itself a specialty. *See Woodard*, 719 N.W.2d at 851 (relying on dictionary definitions to conclude that a subspecialty "is a particular branch of medicine or surgery . . . that falls under a specialty or within the hierarchy of that specialty"); *The American Heritage Dictionary*, *supra* ¶ 15, at 1734 (defining the prefix "sub" as "[b]elow; under; [and] beneath" as well as "[s]ubordinate; [and] secondary").

¶24 By excluding recognized subspecialties from the

13

definition of "specialty," the court of appeals' construction of § 12-2604 is both too broad and too narrow. It would, for example, allow a pediatrician certified by the American Board of Pediatrics but who does not practice in hematology to testify about the care provided by a pediatric hematologist – here, Dr. Wittman – to a seventeen-year-old patient suffering from a serious blood disorder. This is contrary to the statute's goal of ensuring that experts have qualifications and experience comparable to the physician whose conduct is at issue. The opinion below also too narrowly limits "specialty" as embracing only the twenty-four ABMS member boards, thereby excluding a broad range of practice areas certified by these boards as subspecialties or by other certifying bodies.

¶25    UPH notes that the statute refers to a physician's "claimed specialty," and suggests that this term could embrace a subspecialty, such as pediatric hematology-oncology, if the treating physician identified it as his or her "claimed" specialty. We reject this approach because, as noted above, we do not construe the statute to turn on an individual physician's labeling of his or her practice as a particular specialty. Instead, we conclude that the word "claimed" in this context refers to situations in which a physician purports to specialize in an area that is eligible for board certification, regardless of whether the physician in fact limits his or her practice to

14

that area.  *Cf. Lo v. Lee*, 230 Ariz. 457, 460 ¶ 9, 286 P.3d 801, 804 (App. 2012) (holding that a defendant physician with board certification in ophthalmology also had, through his public assertions, a claimed specialty of plastic surgery).

¶26    Whether the relevant "specialty" is an area of general certification, like pediatrics, or subspecialty certification, like pediatric hematology-oncology, will depend on the circumstances of a particular case.  Just as a physician who is a specialist may practice outside of his or her specialty, a physician who is a subspecialist, such as in pediatric hematology-oncology, may afford treatment or care that does not involve that particular subspecialty but is embraced by the broader specialty of pediatrics.  In that event, § 12-2604(A) would require testifying experts to specialize in pediatrics.

## C.

¶27    Applying § 12-2604 in a case in which the treating physician is or claims to be a specialist (that is, to devote a majority of his or her practice to an area eligible for board certification) requires a trial court to make several determinations.  The court must initially determine if the care or treatment at issue involves the identified specialty, which may include recognized subspecialties.  If it does, testifying experts must share the same specialty as the treating physician. The trial court then must determine if the treating physician is

15

board certified within that specialty. If so, any testifying expert must also be board certified in that specialty. (We have no occasion here to interpret the statutory language regarding a treating physician who "claims to be a specialist who is board certified," as Dr. Wittman indisputably is board certified.) Depending on the circumstances, the relevant specialty may be a subspecialty in which the treating physician is board certified.

¶28 The statute does not require a testifying expert to have identical certifications to the treating physician (e.g., when the treating physician has multiple certifications), but only that the expert be certified in the specialty at issue in the particular case. Under § 12-2604(A)(2), proposed experts must have spent a "majority of [their] professional time" during the year preceding the occurrence either practicing or teaching in that specialty or claimed specialty. Because an individual cannot devote a "majority" of his or her time to more than one specialty, the statute suggests that only the one relevant specialty need be matched. *See Woodard*, 719 N.W.2d at 850.

**D.**

¶29 The parties contested below whether the relevant specialty was pediatric hematology-oncology or hematology. The trial court determined that pediatric hematology, in which Dr. Wittman was board certified, was the relevant specialty. (As noted above, the correct terminology is pediatric hematology-

16

oncology.) Because Dr. Brouillard was not certified in this specialty, the trial court ruled that he was not qualified as an expert under § 12-2604. The trial court then granted summary judgment to UPH because, without expert testimony, Mr. Baker lacked the required evidence to establish the standard of care and causation.

**¶30** Apart from issues of statutory interpretation, which we review de novo, we review trial court determinations on expert qualifications for an abuse of discretion. *State v. Keener*, 110 Ariz. 462, 465-66, 520 P.2d 510, 513-14 (1974). This standard of review equally applies to admissibility questions in summary judgment proceedings. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997); *Mohave Elec. Co-op., Inc. v. Byers*, 189 Ariz. 292, 301, 942 P.2d 451, 460 (App. 1997); *Estate of Hanges v. Metro. Prop. & Cas. Ins. Co.*, 997 A.2d 954, 957 (N.J. 2010).

**¶31** The trial court correctly interpreted § 12-2604 to require a testifying expert to be board certified in the same specialty as Dr. Wittman if she was practicing within that specialty while providing the treatment at issue. As the trial court observed, record evidence suggests that both non-pediatric and pediatric hematologists could have treated a seventeen-year-old patient for a blood disorder. The trial court did not abuse its discretion in concluding that Dr. Wittman was practicing

17

within her specialty of pediatric hematology-oncology. Section 12-2604 therefore required a testifying expert to be certified in that specialty, even if physicians in other specialties might also have competently provided the treatment. The trial court did not err in ruling that Dr. Brouillard was not qualified as an expert.

### III.

¶32 We next consider Mr. Baker's argument that, if Dr. Brouillard is not a qualified expert, the statute is unconstitutional. He contends that § 12-2604 violates equal protection and access to the court guarantees under the Federal and Arizona Constitutions, as well as Arizona's anti-abrogation clause and prohibition against special laws. He further urges us to reconsider our recent holding that the statute does not violate the separation of powers. *See Seisinger v. Siebel,* 220 Ariz. 85, 96 ¶ 42, 203 P.3d 483, 494 (2009).

¶33 Our analysis is guided by "a strong presumption supporting the constitutionality of a legislative enactment and the party asserting its unconstitutionality bears the burden of overcoming the presumption." *Eastin v. Broomfield*, 116 Ariz. 576, 580, 570 P.2d 744, 748 (1977).

### A.

¶34 Article 18, Section 6 of the Arizona Constitution states that "[t]he right of action to recover damages for

18

injuries shall never be abrogated." It prohibits "abrogation of all common law actions for negligence, intentional torts, strict liability, defamation, and other actions in tort which trace origins to the common law." *Cronin v. Sheldon*, 195 Ariz. 531, 538 ¶ 35, 991 P.2d 231, 238 (1999). The legislature, however, may "regulate the cause of action for negligence so long as it leaves a claimant reasonable alternatives or choices which will enable him or her to bring the action." *Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 106, 692 P.2d 280, 285 (1984).

¶35 Although the statute might deny a plaintiff his expert of choice, the record does not show that Mr. Baker lacks "reasonable alternatives or choices which will enable him or her to bring the action." *Id.*; *accord Governale v. Lieberman*, 226 Ariz. 443, 447 ¶ 9, 250 P.3d 220, 224 (App. 2011). Section 12-2604 therefore permissibly regulates rather than abrogates Mr. Baker's right to bring a medical malpractice suit.

**B.**

¶36 Both the anti-abrogation clause of the Arizona Constitution and the Fourteenth Amendment of the Federal Constitution protect a plaintiff's right of access to the courts. *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971); *Cronin*, 195 Ariz. at 538-39 ¶ 35, 991 P.2d at 238-39. A court may not, consistent with the Arizona Constitution, prohibit a

19

plaintiff from bringing a common law tort action. *Cronin*, 195 Ariz. at 538-39 ¶ 35, 991 P.2d at 238-39. Nor may a court, under the Due Process Clause, deprive a plaintiff of a meaningful opportunity to be heard. *Boddie*, 401 U.S. at 377.

¶37 Although plaintiffs might face greater difficulties in finding a qualified expert because of a smaller expert pool, § 12-2604 does not bar medical malpractice lawsuits or preclude plaintiffs from recovery in such actions. Accordingly, § 12-2604 does not violate the open-court guarantees of the Arizona and Federal Constitutions.

## C.

¶38 Mr. Baker also contends that, by burdening his right to bring a medical malpractice action, § 12-2604 denies him equal protection under the Federal and Arizona Constitutions. He argues that the statute discriminates against plaintiffs with claims "against licensed healthcare professionals" and also discriminates "between classes of malpractice victims." For support, he states that twenty pediatric hematologists refused to testify and the trial court did not permit his expert, a non-pediatric hematologist, to testify.

¶39 The right to bring a negligence action, although not fundamental under the Federal Constitution, is a fundamental right protected by the anti-abrogation clause of the Arizona Constitution. *Kenyon v. Hammer*, 142 Ariz. 69, 83, 688 P.2d 961,

20

976 (1984); Ariz. Const. art. 18, § 6.

**¶40** The trial court rejected Mr. Baker's equal protection arguments because they had already been addressed and rejected by the court of appeals in *Governale*. In that case, the court ruled that § 12-2604 does not violate the equal protection clause of the Arizona Constitution. *Governale*, 226 Ariz. at 449 ¶ 19, 250 P.3d at 226. Holding that the statute does not affect the fundamental right to bring a medical malpractice action, the court applied rational basis scrutiny to uphold the statute because it is rationally related to a legitimate governmental interest. *Id.* at 448-49 ¶¶ 15-19, 250 P.3d at 225-26. The court of appeals in this case affirmed the trial court's ruling, holding that Mr. Baker failed to distinguish his equal protection claim from that raised in *Governale*. *Baker*, 228 Ariz. at 593 ¶ 22, 269 P.3d at 1217.

**¶41** This Court has stated that, "[i]f [the right to bring an action for damages] is 'fundamental,' the strict scrutiny analysis must be applied." *Kenyon*, 142 Ariz. at 79, 688 P.2d at 971. To survive a strict scrutiny analysis, a statute must serve a compelling state interest and be necessary to achieve that interest. *Id.* at 78, 688 P.2d at 970. However, this Court has sometimes applied rational basis review rather than strict scrutiny to medical malpractice statutes that allegedly affected plaintiffs' rights. *See Eastin*, 116 Ariz. at 582-86, 570 P.2d

21

at 750–54 (applying rational basis scrutiny).

**¶42**      Our analysis in cases like *Kenyon* and *Eastin* has not distinguished between equal protection claims based on alleged violations of other constitutional provisions, such as the anti-abrogation clause, and claims based upon an impermissible classification.  We now clarify our prior decisions in this respect.

**¶43**      This Court in *Eastin* applied a rational basis test to analyze equal protection challenges to a medical malpractice statute creating a medical liability review panel, abrogating the collateral source rule, and requiring a $2000 cost bond. *Id.*  We observed that the "traditional equal protection test," requiring challenged legislation to have a "reasonable basis," should apply in the area of economics and social welfare.  *Id.* at 582, 570 P.2d at 750 (internal quotation marks omitted) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).  We held that the provisions creating a medical review panel, by providing a mechanism to separate meritorious medical malpractice claims from frivolous ones, did not offend Arizona's equal protection clause.  *Id.* at 582–83, 570 P.2d at 750–51. Likewise, we reasoned that the abolition of the collateral source evidentiary rule was reasonably related to the legislative goal of decreasing malpractice premiums by scaling down the size of jury verdicts.  *Id.* at 585, 570 P.2d at 753.

22

We did, however, hold that requiring a plaintiff to post a $2000 cost bond violated the privileges and immunities clause of the Arizona Constitution because it limited access to the courts. *Id.* at 585–86, 570 P.2d at 753–54.

**¶44** In *Kenyon*, however, the Court held that the right to bring an action to recover damages is fundamental under the Arizona Constitution and applied strict scrutiny to an equal protection challenge to a medical malpractice statute. 142 Ariz. at 83, 688 P.2d at 975. Although *Eastin* had generally applied a rational basis standard in reviewing a medical malpractice statute, and struck down only the $2000 bond requirement that affected access to the courts, the *Kenyon* court declared that *Eastin* "stands for the proposition that where the fundamental right to bring or pursue the action is affected, this court will not apply the rational basis analysis." *Id.*

**¶45** Relying on *Kenyon*, Mr. Baker urges the Court to apply greater scrutiny to an equal protection claim based on a violation of the anti-abrogation clause than would apply to an alleged violation of the anti-abrogation clause itself. We decline to do so.

**¶46** We have recognized in the First Amendment context that the same level of scrutiny – intermediate scrutiny – applies to equal protection claims involving the First Amendment as applies to First Amendment claims themselves. *Coleman v. City of Mesa*,

23

230 Ariz. 352, 362 ¶ 41, 284 P.3d 863, 873 (2012). Consistent with several other courts, we have recognized that applying strict scrutiny "simply because it burdened constitutionally protected speech" would nullify the intermediate-scrutiny test applied to content-neutral time, place, and manner restrictions. *Id.* at ¶ 42 (quoting *Brown v. City of Pittsburgh*, 586 F.3d 263, 283 n.22 (3d Cir. 2009)).

¶47 Similarly, we see no reason to apply a higher level of scrutiny to an equal protection claim involving non-suspect classifications grounded in the anti-abrogation clause of the Arizona Constitution than to the abrogation claim itself. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))).

¶48 Our declining to apply strict scrutiny does not itself preclude Mr. Baker's equal protection claim. *Cf. Governale*, 226 Ariz. at 448-49 ¶¶ 15, 17-19, 250 P.3d at 225-26 (holding that § 12-2604 does not affect a fundamental right and that, under a rational basis analysis, the statute does not violate the equal protection provision of the Arizona Constitution).

¶49     To the extent Mr. Baker claims the statute impermissibly discriminates among plaintiffs, the classification is reviewed under a rational basis standard because no suspect class is implicated. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973). By elevating the requisite qualifications for experts in the medical malpractice context, § 12-2604 conceivably furthers a legitimate interest by decreasing medical malpractice insurance rates and the reluctance of physicians to practice in Arizona. *See Seisinger*, 220 Ariz. at 96 ¶ 41, 203 P.3d at 494. Because a rational basis supports the "heightened level of proof," *id.* at ¶ 40, the statute does not violate the equal protection provisions of the Arizona or Federal Constitutions.

**D.**

¶50     Section 12-2604 also does not violate Arizona's constitutional prohibition on the enactment of "special laws" in areas that include "[c]hanging [the] rules of evidence," "[r]egulating the practice of courts of justice," and the "[l]imitation of civil actions." Ariz. Const. art. 4, pt. 2, § 19(3), (5), (6). To determine whether a statute is a prohibited special law, the Court considers: (i) "whether the classification has a reasonable basis," (ii) "whether the classification encompasses all members of the relevant class," and (iii) "whether the class is elastic," permitting members to

25

move in and out. *See Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 149, 800 P.2d 1251, 1257 (1990).

¶51 As discussed, *supra* Part III.C, § 12-2604 has a rational basis because it is reasonably related to the goals of ameliorating the public health problems of rising medical malpractice insurance rates and the reluctance of qualified physicians to practice in Arizona, *Seisinger*, 220 Ariz. at 96 ¶ 41, 203 P.3d at 494. The statute focuses on the qualifications of experts, offered by any party, regarding the appropriate standard of care by a health professional in a medical malpractice action. Because it applies to any party seeking to offer an expert, § 12-2604 encompasses the relevant class. *Republic Inv. Fund I*, 166 Ariz. at 150, 800 P.2d at 1258. Further, the class is elastic because the identities of parties and their experts will change over time. *See Governale*, 226 Ariz. at 449-50 ¶ 21, 250 P.3d at 226-27. Accordingly, the statute is not a special law prohibited by the Arizona Constitution.

## E.

¶52 Finally, we decline to reconsider our holding in *Seisinger,* 220 Ariz. at 96 ¶ 42, 203 P.3d at 494, that § 12-2604 does not violate the separation of powers doctrine.

## IV.

¶53 For the foregoing reasons, we vacate the court of

appeals' opinion, except ¶ 1 insofar as it vacates the trial court's judgment and directs the trial court on remand to allow Mr. Baker an opportunity to identify an expert with the qualifications required by A.R.S. § 12-2604 (an issue we declined to review), and remand the case to the trial court for proceedings consistent with this opinion.


                                      _____

                                        Scott Bales, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice


_____
Michael J. Brown, Judge*


*Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Michael J. Brown, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.