IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

AMANDA WATTS, AN ADULT INDIVIDUAL,
*Plaintiff/Appellant*,

*v.*

MEDICIS PHARMACEUTICAL CORPORATION, AN ARIZONA CORPORATION,
*Defendant/Appellee*.

No. CV-15-0065-PR
Filed January 21, 2016

Appeal from the Superior Court in Maricopa County
The Honorable Lisa Daniel Flores, Judge
No. CV2012-008081
**REVERSED**

Opinion of the Court of Appeals, Division One
236 Ariz. 511, 342 P.3d 847 (App. 2015)
**AFFIRMED IN PART; VACATED IN PART**

COUNSEL:

Mick Levin (argued), Michael D. Malin, Mick Levin, P.L.C., Phoenix,
Attorneys for Amanda Watts

Donald L. Myles, Jr., Lori L. Voepel (argued), Joshua M. Snell, Jones, Skelton
& Hochuli, P.L.C., Phoenix, Attorneys for Medicis Pharmaceutical
Corporation

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor
General, David W. Garbarino, Stephen J. Emedi, Assistant Attorneys
General, Phoenix, Attorneys for Amicus Curiae State of Arizona

Stanley G. Feldman, Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., Tucson; and David L. Abney, Dana R. Roberts, Knapp & Roberts, P.C., Scottsdale, Attorneys for Amicus Curiae Arizona Association for Justice/Arizona Trial Lawyers Association

Wayne D. Struble, Bowman and Brooke LLP, Phoenix, Attorney for Amicus Curiae The Product Liability Advisory Council, Inc.

Alan Blankenheimer, Covington & Burling LLP, Los Angeles, CA; Michael X. Imbroscio (argued), Paul W. Schmidt, Covington & Burling LLP, Washington, D.C., Attorneys for Amicus Curiae The Pharmaceutical Research and Manufacturers of America, the U.S. Chamber of Commerce, the U.S. Chamber Litigation Center, the Arizona Chamber of Commerce & Industry, and the Arizona Manufacturers Council

---

VICE CHIEF JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BALES and JUSTICES BRUTINEL, TIMMER, and BERCH (RETIRED) joined.

---

VICE CHIEF JUSTICE PELANDER, opinion of the Court:

¶1        Under the learned intermediary doctrine ("LID"), a manufacturer satisfies its duty to warn end users by giving appropriate warnings to the specialized class of persons who may prescribe or administer the product.  We hold today that the LID generally applies to a prescription drug manufacturer.  We further conclude that the LID is not displaced by the Uniform Contribution Among Tortfeasors Act ("UCATA"), A.R.S. §§ 12-2501 through -2509.  Finally, we hold that prescription drugs are "merchandise" for purposes of the Consumer Fraud Act ("CFA"), A.R.S. §§ 44-1521 through -1534, and the CFA does not require a direct merchant-consumer transaction to support a patient's statutory claim against a drug manufacturer.

**I.**

¶2        Because the superior court dismissed the plaintiff's complaint under Arizona Rule of Civil Procedure 12(b)(6), we "look only to the pleading itself" and consider its well-pleaded factual allegations,

2

reasonable inferences from the alleged facts, and the complaint's exhibits. *Cullen v. Auto–Owners Ins. Co.*, 218 Ariz. 417, 419 ¶ 7, 189 P.3d 344, 346 (2008); *see Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 9, 284 P.3d 863, 867 (2012).

¶3        Medicis Pharmaceutical Corporation manufactures and distributes Solodyn, which contains minocycline. In its full prescribing informational materials for Solodyn, Medicis warns: "The long-term use of minocycline in the treatment of acne has been associated with drug-induced lupus-like syndrome, autoimmune hepatitis and vasculitis." Those materials also state: "Autoimmune syndromes, including drug-induced lupus-like syndrome, autoimmune hepatitis, vasculitis and serum sickness have been observed with tetracycline-class drugs, including minocycline. Symptoms may be manifested by arthralgia, fever, rash and malaise. Patients who experience such symptoms should be cautioned to stop the drug immediately and seek medical help."

¶4        In April 2008, Amanda Watts, then a minor, sought medical treatment for acne and received a prescription for Solodyn from her medical provider. Watts apparently did not receive the full prescribing information noted above, but did receive two other publications about the drug. The first was a "MediSAVE" card, which her medical provider gave to her, that outlined a discount-purchasing program for Solodyn. The MediSAVE card and its accompanying information stated that "[t]he safety of using [Solodyn] longer than 12 weeks has not been studied and is not known." Second, Watts received an informational insert about Solodyn from her pharmacist. The insert warned that patients should consult a doctor if symptoms did not improve within twelve weeks. Watts used Solodyn as prescribed for twenty weeks.

¶5        About two years later, Watts received another prescription for Solodyn and took it as directed for another twenty weeks. In October 2010, Watts was hospitalized and diagnosed with drug-induced lupus and hepatitis, both allegedly side effects from using Solodyn. Although she has recovered from the hepatitis, doctors expect her to have lupus for the rest of her life.

¶6        Watts sued Medicis alleging consumer fraud and product liability, seeking both compensatory and punitive damages. In her statutory CFA claim, Watts alleged that in connection with the sale or

advertisement of Solodyn, Medicis knowingly misrepresented and omitted material facts on the MediSAVE card she received and on which she relied. She also alleged that the drug was defective and unreasonably dangerous because Medicis failed to adequately warn her of the consequences of its long-term use. The superior court granted Medicis's motion to dismiss.

¶7        The court of appeals vacated the judgment of dismissal and remanded the case for further proceedings. *Watts v. Medicis Pharm. Corp.*, 236 Ariz. 511, 513 ¶ 1, 342 P.3d 847, 849 (App. 2015). The court concluded that the LID "is inconsistent with UCATA" and "cannot coexist with" that Act. *Id.* at 518 ¶ 35, 519 ¶ 38, 342 P.3d at 854, 855. Noting "the realities of modern-day pharmaceutical marketing," the court of appeals also found the policy rationale for the LID is "not persuasive now." *Id.* at 519 ¶ 37, 520 ¶ 41, 342 P.3d at 855, 856.

¶8        We granted review because the legal issues are of statewide importance and likely to recur. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶9        We review dismissal of claims under Rule 12(b)(6) de novo. *Coleman*, 230 Ariz. at 355–56 ¶¶ 7–8, 284 P.3d at 866–67. We also review the interpretation of a statute de novo. *See Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996).

## A.

¶10        Generally, a claim of strict products liability may be based on "informational defects encompassing instructions and warnings" that render a product defective and unreasonably dangerous. *Gosewisch v. Am. Honda Motor Co.*, 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987). To establish such a claim, the plaintiff must prove, among other things, that the manufacturer had a duty to warn of the product's dangerous propensities and that the lack of an adequate warning made the product defective and unreasonably dangerous. *Id.* "In certain contexts, however, the manufacturer's or supplier's duty to warn end users of the dangerous propensities of its product is limited to providing an adequate warning to an intermediary, who then assumes the duty to pass the necessary warnings

4

on to the end users." *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 154 (Tex. 2012). This legal doctrine is known as the LID.

**¶11**        In 1978, our court of appeals adopted the LID in a product liability case against pharmaceutical companies that manufactured a drug that allegedly was unsafe due to informational defects. *Dyer v. Best Pharmacal*, 118 Ariz. 465, 577 P.2d 1084 (App. 1978). In affirming summary judgment in favor of the drug companies, the court applied the LID, finding that the doctrine was supported by principles of both duty and causation. *Id.* at 467–69, 577 P.2d at 1086–88. Regarding duty, "[a] drug manufacturer has discharged his duty to the public if he has properly warned the administering physician of the contraindications and possible side effects of the drug." *Id.* at 468, 577 P.2d at 1087. Regarding causation, a learned intermediary (the prescribing physician) who received an adequate warning regarding a drug's side effects or proper use but unforeseeably disregarded the warning constituted an intervening, superseding event that broke the chain of causation between the manufacturer and the patient. *Id.* at 467–69, 577 P.2d at 1086–88.

**¶12**        As subsequent Arizona cases have recognized, the LID is based on principles of duty, not causation. *See, e.g.*, *Dole Food Co. v. N.C. Foam Indus., Inc.*, 188 Ariz. 298, 302–03, 935 P.2d 876, 880–81 (App. 1996) (assessing factors to determine when, under the LID, the "manufacturer's duty to warn is ordinarily satisfied"); *Davis v. Cessna Aircraft Corp.*, 182 Ariz. 26, 38, 893 P.2d 26, 38 (App. 1994) (applying the LID "to determine whether [a manufacturer] satisfied its duty to warn"); *see also* Restatement (Third) of Torts: Prod. Liab. § 6 cmt. b (Am. Law Inst. 1998) ("Third Restatement") ("The rationale supporting this 'learned intermediary' rule is that only health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescription-based therapy. The duty then devolves on the health-care provider to supply to the patient such information as is deemed appropriate under the circumstances so that the patient can make an informed choice as to therapy."). Thus, the court of appeals here correctly remarked that, "[i]n its application, the [LID] appears to be less a rule of causation and more a standard for determining when a drug manufacturer has satisfied its duty to warn." *Watts*, 236 Ariz. at 517 ¶ 31, 342 P.3d at 853.

¶13　　　　　　Manufacturers generally have a duty to warn consumers of foreseeable risks of harm from using their products. *See* Third Restatement at § 2. But under the LID, if the manufacturer provides complete, accurate, and appropriate warnings about the product to the learned intermediary, it fulfills its duty to warn the consumer. *See id.* at § 6; *Centocor*, 372 S.W.3d at 142. The premise for the LID is that certain types of goods (such as prescription drugs) are complex and vary in effect, depending on the end user's unique circumstances, and therefore can be obtained only through a qualified intermediary like a prescribing physician, who can evaluate the patient's condition and weigh the risks and benefits. *See Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir. 1974). As applied to prescription drug manufacturers, the Third Restatement states the doctrine as follows:

> A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to:
>
> 　　　(1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings; or
>
> 　　　(2) the patient when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings.

Third Restatement § 6(d).

¶14　　　　　　Although the court of appeals has embraced the LID, this Court has not yet addressed the doctrine. In our view, the Third Restatement properly states the LID, and therefore we adopt § 6(d) as our expression of it. *Cf. Ft. Lowell-NSS Ltd. P'ship v. Kelly*, 166 Ariz. 96, 102, 800 P.2d 962, 968 (1990) ("Absent Arizona law to the contrary, this court will usually apply the law of the Restatement."); *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 770 (Ky. 2004) (adopting the Restatement Third's expression of the LID); *Freeman v. Hoffman-La Roche, Inc.*, 618 N.W.2d 827, 842 (Neb. 2000) (adopting the Third Restatement § 6(d)). Adopting the doctrine places us with the majority of jurisdictions that have considered the matter. *See generally Centocor*, 372 S.W.3d at 158 n.17 (noting that "the highest courts of

at least thirty-five states have adopted some form of the [LID] within the prescription drug products-liability context or cited favorably to its application within this context").

¶15　　　　Contrary to Watts's assertion, the LID does not create a blanket immunity for pharmaceutical manufacturers. The doctrine does not apply, for instance, if the manufacturer fails to provide adequate warnings to the learned intermediary. *See McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (Or. 1974) (if it fails to properly warn the prescribing physician, "the manufacturer is directly liable to the patient for a breach of such duty."); *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn. 1994) ("[T]he learned intermediary doctrine does not shield a drug manufacturer from liability for inadequate warnings to the physician."). In that event, as Medicis acknowledged at oral argument in this Court, a patient could sue and directly recover from a drug manufacturer based on its failure to properly warn the prescribing physician.

¶16　　　　Watts also asserts, and the court of appeals agreed, that the underlying rationale for the LID is no longer viable. But we find persuasive the reasoning of the Texas Supreme Court in rejecting this argument.

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer. . . . Because patients can obtain prescription drugs only through their prescribing physician or another authorized intermediary and because the "learned intermediary" is best suited to weigh the patient's individual needs in conjunction with the risks and benefits of the prescription drug, we are in agreement with the overwhelming majority of other courts

7

that have considered the learned intermediary doctrine and hold that, within the physician-patient relationship, the learned intermediary doctrine applies and generally limits the drug manufacturer's duty to warn to the prescribing physician.

*Centocor*, 372 S.W.3d at 159 (citations omitted); *see also Larkin*, 153 S.W.3d at 763–64 (stating that policy reasons support the LID because (1) the "prescribing physician is in a superior position to impart the warning and can provide an independent medical decision as to whether use of the drug is appropriate for treatment of a particular patient," (2) the "manufacturers lack effective means to communicate directly with each patient," and (3) any duty to directly warn the end user would unduly interfere with the physician-patient relationship).

¶17        In finding the policy rationale for the LID unpersuasive, the court of appeals relied on *State ex rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899 (W. Va. 2007).  In *Karl*, the West Virginia Supreme Court found the LID outdated and that "existing law of comparative contribution among joint tortfeasors is adequate to address issues of liability among physicians and drug companies . . . ."  *Id.* at 913.  No other court has followed *Karl*, and several courts have criticized it.  *See Centocor*, 372 S.W.3d at 158 (noting that no other court has followed *Karl*); *see also Tyree v. Boston Sci. Corp.*, 56 F. Supp. 3d 826, 828 n.2 (S.D. W. Va. 2014) (discussing *Karl* and surveying jurisdictions that have rejected its reasoning).  Even the West Virginia Supreme Court itself later relegated *Karl* to a "but see" citation, observing that "the high degree of federal regulation of prescriptive drug products attenuates the effect product marketing has on a consumer's prescriptive drug purchasing decision."  *White v. Wyeth*, 705 S.E.2d 828, 838 (W. Va. 2010).  Like these other courts, we do not find *Karl* persuasive.

¶18        Watts alternatively urges this Court to adopt a direct-to-consumer ("DTC") advertising exception to the LID.  *See Perez v. Wyeth Labs. Inc.*, 734 A.2d 1245, 1247, 1256 (N.J. 1999) (concluding that "when mass marketing of prescription drugs seeks to influence a patient's choice of a drug, a pharmaceutical manufacturer that makes direct claims to consumers for the efficacy of its product should not be unqualifiedly relieved of a duty to provide proper warnings of the dangers or side effects of the product," and "[c]onsumer-direct advertising of pharmaceuticals thus belies each of the premises on which the [LID] rests").  The Third

Restatement, however, provides a different exception to the LID that sufficiently protects consumers. *See* Third Restatement § 6(d)(2) ("A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to: . . . the patient when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings.").

¶19        In light of this broad exception, we decline to recognize a DTC advertising exception, which has been adopted only in New Jersey. *See Centocor*, 372 S.W.3d at 161 (noting that "[i]n the more than twelve years since *Perez*, many courts have declined to follow [New Jersey's] sweeping departure from the [LID]"); *Larkin*, 153 S.W.3d at 766 (surveying exceptions to the LID and noting that only New Jersey has adopted the DTC advertising exception); *see also Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1376 (S.D. Fla. 2007) (stating that "[s]ince *Perez* was decided, no court . . . has recognized the DTC exception to the learned intermediary doctrine, and several courts have expressly rejected the DTC exception").

## B.

¶20        In 1984, the Arizona Legislature enacted UCATA, which allows a tortfeasor who paid more than its share of damages attributed to it by the factfinder to seek contribution from other co-tortfeasors. A.R.S. § 12-2505. Three years later, the legislature amended the Act by eliminating plaintiffs' ability to recover jointly from any or all liable defendants. A.R.S. § 12-2506(A). This Court has noted that Arizona's pure comparative fault scheme protects defendants from bearing more than their fair share of liability for a plaintiff's injuries under the harsh common-law rule of joint and several liability. *State Farm Ins. Co. v. Premier Manufactured Sys., Inc.*, 217 Ariz. 222, 224–25 ¶¶ 8–12, 172 P.3d 410, 412–13 (2007).

¶21        The court of appeals erred by concluding that the LID is incompatible with UCATA. As the court correctly observed, "UCATA's ultimate effect was to prevent a partially responsible defendant from being held liable for the damages caused by his co-defendant." *Watts*, 236 Ariz. at 518 ¶ 36, 342 P.3d at 854. The LID, the court reasoned, "precludes a complete assessment of comparative fault among tortfeasors because it preemptively limits the scope of a manufacturer's duty." *Id.* The court of

appeals thus concluded that "applying the [LID] in the context of prescription pharmaceuticals conflicts with both UCATA and the holding of *Premier Manufactured Systems* that each defendant in a tort case is liable for his or her own respective share of fault, no more and no less." *Id.*

¶22 We find that reasoning flawed. Neither UCATA nor our case law undermines the LID. UCATA requires apportionment of damages based on degrees of fault. *See* A.R.S. §§ 12-2506(A) ("Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ."); -2506(B) ("In assessing percentages of fault the trier of fact shall consider the fault of all persons who contributed to the alleged injury . . . ."). "Fault" is defined as "an actionable breach of legal duty, act or omission . . . ." A.R.S. § 12-2506(F)(2). Thus, UCATA's scheme is premised on notions of fault, which necessarily presuppose a breach of duty. Under the LID, however, a manufacturer satisfies its duty to warn the end user by adequately warning the learned intermediary, which duty, if satisfied, means that no actionable breach of a legal duty to the end user occurs. *See Dole Food*, 188 Ariz. at 302-03, 935 P.2d at 880–81; *Davis*, 182 Ariz. at 38, 893 P.2d at 38.

¶23 Because the LID and UCATA address two distinct subjects, they are not mutually exclusive. The LID identifies circumstances when a manufacturer has met its duty to warn and thus is not at fault. UCATA does not identify the scope of duties or when parties are at fault; instead, given a determination that multiple parties are at fault, it specifies how liability is apportioned among them.

¶24 In sum, the LID neither insulates a manufacturer from liability in proportion to its share of fault nor shifts a disproportionate share of liability to someone else. Rather, the doctrine provides a means by which a manufacturer may satisfy its duty to warn the end user. A manufacturer that properly warns the learned intermediary fulfills its duty, a result that comports with UCATA because the drug manufacturer in that circumstance has not breached its duty and therefore is not at fault. *See Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 853 (10th Cir. 2003) (noting that "Wyoming's [pure] comparative fault statute has no effect on the application of the [LID]" because the doctrine "addresses a drug manufacturer's duty to provide a warning to consumers," whereas the statutory scheme does not "define[] or affect[] the scope of the defendant's initial duty") (citations omitted). But if the manufacturer fails to properly

warn the learned intermediary, it may be found to have breached its duty and its liability can be determined based on comparative fault under UCATA.

## C.

**¶25** Watts and an amicus curiae also argue that the LID violates the anti-abrogation clause in article 18, § 6 of the Arizona Constitution. This clause provides that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation . . . ." Ariz. Const. art. 18, § 6.

**¶26** The LID is a common-law doctrine, not a statutory limitation. *See* Third Restatement § 6 cmt. a; *Cronin v. Sheldon*, 195 Ariz. 531, 540–41 ¶¶ 44–46, 991 P.2d 231, 240–41 (1999) (discussing that the anti-abrogation clause limits the legislature's ability to abrogate a common-law claim but allows the legislature to regulate common-law claims). "Our anti-abrogation jurisprudence normally asks whether a statute unconstitutionally deprives a litigant of access to the courts." *Nunez v. Prof'l Transit Mgmt. of Tucson, Inc.*, 229 Ariz. 117, 123 ¶ 26, 271 P.3d 1104, 1110 (2012). Article 18, § 6 does not preclude this Court from declaring, clarifying, or modifying the common law, *id.*, and therefore the LID does not offend that clause.

**¶27** Moreover, the LID does not abrogate a right to recover damages, but instead provides a means for a manufacturer to fulfill its duty to warn the end user by properly warning the learned intermediary. *See* Third Restatement § 6 cmt. b; *see also Larkin*, 153 S.W.3d at 765. It does not prevent a plaintiff from asserting an action against the manufacturer in appropriate circumstances, such as when the full medical information and warnings are not given to the medical provider. *See Premier Manufactured Sys., Inc.*, 217 Ariz. at 228 ¶¶ 27–30, 172 P.3d at 416; *see also Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 388 ¶¶ 34–35, 296 P.3d 42, 51 (2013) (discussing that the plaintiff still had a reasonable possibility of obtaining legal redress under the applicable statute); *Nunez*, 229 Ariz. at 122–23 ¶¶ 24–26, 271 P.3d at 1109–10 (discussing that the application of a different duty of care did not violate the anti-abrogation clause because the defendant still had reasonable possibility of obtaining legal redress). The LID also does not prevent the plaintiff from suing the prescribing medical provider.

**D.**

**¶28**     Watts did not allege in her complaint that she received the full prescribing informational materials, see *supra* ¶ 3, but she did allege that "Medicis provided" those warnings, without specifying to whom, and attached them as an exhibit to her complaint. Watts also did not specifically allege that Medicis breached its duty by giving inadequate or otherwise defective warnings to her prescribing physician and other health-care providers who were in a position to reduce the risks of harm. She did allege more generally, however, that "Medicis failed to provide an adequate warning of the danger" of using Solodyn for more than twelve weeks.

**¶29**     Viewed in a light most favorable to Watts, *Cullen*, 218 Ariz. at 419 ¶ 7, 189 P.3d at 346, her complaint implies that Medicis failed to give appropriate warnings to her or the pertinent health-care provider. Accordingly, we vacate the superior court's dismissal of Watts's product liability claim and remand the case for further proceedings.  If Medicis establishes that there is no genuine factual dispute that it provided complete, adequate warnings for Solodyn to Watts's prescribing physician and other health-care providers who were in a position to reduce the risks of harm, the LID applies and, as a matter of law, Medicis satisfied its duty to warn and would be entitled to summary judgment on the product liability claim.

**E.**

**¶30**     Medicis additionally asserts that the court of appeals erred by finding the CFA applicable to this case because prescription pharmaceuticals are not merchandise and there is no direct merchant-consumer transaction between drug manufacturers and patients. We disagree.

**¶31**     The CFA provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, *in*

> *connection with the sale or advertisement of any merchandise*
> whether or not any person has in fact been misled, deceived
> or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A) (emphasis added). Thus, the statute does not expressly require a direct merchant-consumer transaction. Rather, to succeed on a claim of consumer fraud, a plaintiff must show (1) a false promise or misrepresentation made in connection with the sale or advertisement of "merchandise," and (2) consequent and proximate injury resulting from the misrepresentation. *See Kuehn v. Stanley*, 208 Ariz. 124, 129 ¶ 16, 91 P.3d 346, 351 (App. 2004).

**¶32**         The CFA defines "merchandise" as "any objects, wares, goods, commodities, intangibles . . . ." A.R.S. § 44-1521(5). The statute does not define "objects" or "goods." Absent statutory definitions, courts generally apply common meanings, *State v. Cox*, 217 Ariz. 353, 356 ¶ 20, 174 P.3d 265, 268 (2007), and may resort to dictionary definitions, *State ex rel. Montgomery v. Harris* (*Shilgevorkyan*), 234 Ariz. 343, 344 ¶ 9, 322 P.3d 160, 161 (2014).

**¶33**         As relevant to this case, the noun "object" is defined as "something that is put or may be regarded as put in the way of some of the senses: a discrete visible or tangible thing." Webster's Third New International Dictionary 1555 (2002). Likewise, a definition of "good" is "tangible movable personal property having intrinsic value but [usually] excluding money and other choses in action . . . ." *Id.* at 978. Under those definitions, pharmaceutical drugs are objects and goods and thus constitute "merchandise" under the CFA. The court of appeals did not err in concluding that the CFA applies to prescription pharmaceuticals.

**¶34**         Here, Watts alleged an actionable claim under the CFA. She alleged that Medicis affirmatively misrepresented Solodyn by stating that "[t]he safety of using [Solodyn] longer than 12 weeks has not been studied and is not known," even though it knew (as Medicis's full prescribing informational material states) that taking the drug for longer than twelve weeks can cause drug-induced lupus. The superior court thus erred in dismissing Watts's CFA claim.

**¶35**         We express no opinion on two points that were not argued in either the trial court or court of appeals and are beyond the issues framed

in Medicis's petition for review in this Court, without prejudice to the parties further litigating them on remand:  (1) whether the MediSAVE card that Watts received is an "advertisement" under the CFA, §§ 44-1521(1), -1522(A), and (2) whether federal law preempts Watts's CFA claim.  *See generally* Third Restatement § 6 cmt. b. (discussing that federal law may displace certain state tort claims).

## III.

¶36        For the foregoing reasons, we vacate ¶¶ 28–41 of the court of appeals' opinion and affirm the portion relating to Watts's CFA claim, *Watts*, 236 Ariz. at 516–17 ¶¶ 23–27, 342 P.3d at 852–53.  We reverse the superior court's order dismissing Watts's complaint, and we remand the case to that court for further proceedings consistent with this opinion.