IN THE

# ARIZONA COURT OF APPEALS
### DIVISION TWO

---

KAREN D. RASOR AND DONALD MILLER, WIFE AND HUSBAND,
*Plaintiffs/Appellants/Cross-Appellees,*

*v.*

NORTHWEST HOSPITAL, LLC DBA NORTHWEST MEDICAL CENTER,
*Defendant/Appellee/Cross-Appellant.*

No. 2 CA-CV 2015-0065
Filed May 17, 2016

---

Appeal from the Superior Court in Pima County
No. C20133700
The Honorable Leslie Miller, Judge

**AFFIRMED IN PART; REVERSED AND VACATED IN PART;
AND REMANDED**

---

COUNSEL

Miniat & Wilson, LPC, Tucson
By Kevin E. Miniat
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Campbell, Yost, Clare & Norell, P.C., Phoenix
By Kari B. Zangerle and Mary G. Isban
*Counsel for Defendant/Appellee/Cross-Appellant*

---

**OPINION**

Judge Espinosa authored the opinion of the Court, in which Presiding Judge Howard and Judge Staring concurred.

---

E S P I N O S A, Judge:

**¶1**        In this medical malpractice action, appellants Karyn Rasor and her husband, Donald Miller, (hereafter referred to as the Rasors) appeal the trial court's grant of summary judgment in favor of appellee Northwest Medical Center (NWMC or "the hospital") and its rulings on certain discovery and the denial of leave to secure additional experts.   NWMC cross-appeals, asserting the court abused its discretion by ordering it to produce certain patient records.  For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

**Factual and Procedural Background**

**¶2**        In reviewing a grant of summary judgment, we view the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party.  *See Gorney v. Meaney*, 214 Ariz. 226, ¶ 2, 150 P.3d 799, 801 (App. 2007).  From July 7 to July 29, 2011, Rasor, then fifty-one years old, was a patient at NWMC, with "a long and complicated past medical history."  Rasor was diagnosed with a faulty mitral valve, coronary artery disease, and congestive heart failure.  On July 18, she underwent open-heart surgery lasting over seven hours during which she lay supine.  Shortly after the procedure and while in transit to her hospital bed, Rasor suffered a cardiac arrest requiring CPR[1] followed by the insertion of an intra-aortic balloon pump (IABP).  The IABP was threaded through the femoral artery in Rasor's leg to her aorta, requiring that her leg be immobilized.

---

[1]Cardiopulmonary resuscitation.

¶3 Rasor, while connected to an external pacemaker, the balloon pump console, various intra-venous lines, and a ventilator, was transported to the intensive care unit (ICU) where she was the sole patient of Nurse Michael Farrand, RN.[2] At his deposition, Farrand testified, "[a]nything that deviates the patient's position can theoretically cause . . . the actual balloon on the end of the pump, to go out of place" and "you have to be just extremely careful when you move the patient that the lines don't get kinked, that nothing gets pulled."

¶4 The IABP was removed on July 21. Farrand described how, during its removal, the patient's catheterized leg must be clamped to the bed so tightly that for the first five minutes the patient's foot turns blue, with the clamp slowly released over the course of an hour to allow the blood to clot. Thereafter, the patient must lie flat for eight hours so as not to dislodge the clot. On July 22, another ICU nurse noted a discoloration to Rasor's coccyx which she described as a suspected deep-tissue injury, a category of pressure ulcer.[3] On July 26, Rasor underwent a cardiac catheterization lasting over an hour and after which she was required to keep her leg straight for six hours. On July 27, the nursing staff requested a consult by NWMC's wound-care department and a wound-care nurse provided Rasor with a specialty mattress. Rasor's pressure ulcer ultimately reached "stage

---

[2]Farrand testified at his deposition that he had "not take[n] another patient" "for [his] entire shift" because "as long as a patient is unstable, [he would] not take a second one." He noted, "[i]f a patient had a difficult surgery with unexpected complications, we generally will not pair them until we get rid of some of the extra equipment we were not expecting."

[3] A reference provided by the Rasors below describes a pressure ulcer as a "localized injury to the skin and/or underlying tissue usually over a bony prominence, as a result of pressure, or pressure in combination with shear." European Pressure Ulcer Advisory Panel & National Pressure Ulcer Advisory Panel, *Prevention of Pressure Ulcers: Quick Reference Guide*, at 7 (2009).

IV," eventually requiring thirty-one debridement procedures and resulting in pain and symptoms alleged to be permanent.

¶5         In July 2013, the Rasors brought a medical malpractice action against NWMC, alleging that during Rasor's hospitalization NWMC had "breached its professional duties . . . , proximately causing the development of a decubitus ulcer" by failing to "appropriately off-load[4] . . . Rasor" and "negligently fail[ing] to timely discover" the ulcer.  The Rasors retained one expert, a board-certified, wound-care nurse, Julie Ho, R.N., and filed a preemptive motion seeking to introduce Ho's expert opinion testimony concerning standard of care, causation, and prognosis.  They also filed a motion for partial summary judgment alleging the hospital's failure to treat the pressure ulcer for five days after its discovery had violated the standard of care.  NWMC then filed its motion for summary judgment, asserting that the Rasors' "standard of care/causation expert does not qualify under Arizona Rule of Evidence, Rule 702, A.R.S. § 12-2603, and A.R.S. § 12-2604 to render standard of care or causation opinions in this matter" and consequently the Rasors "are unable to establish that [the hospital] breached the applicable standard of care and [the] Complaint should be dismissed."

¶6         In December 2014, the trial court ruled that the Rasors were permitted to introduce Ho's "expert opinion . . . regarding wound care," but deferred the remaining issues until the hearing on NWMC's motion for summary judgment.  In January 2015, the court denied the Rasors' motion for partial summary judgment, granted NWMC's motion for summary judgment and denied the Rasors' request to secure a new expert.  A formal judgment bearing Ariz. R. Civ. P. 54(c) language was entered, dismissing the Rasors' complaint with prejudice, and both parties appealed.  This court has jurisdiction over the Rasors' appeal and NWMC's cross-appeal pursuant to A.R.S. §§ 12-120.21(A)(1) and 12-2101(A)(1).

---

[4]According to medical literature provided by the Rasors, to "off-load[]" is to minimize pressure.  Institute for Clinical Systems Improvement, *Pressure Ulcer Prevention and Treatment Protocol*, at 20 (3d ed. Jan. 2012).

**Summary Judgment Ruling**

¶7        Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). We review de novo a trial court's grant of summary judgment and view the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Felipe v. Theme Tech Corp.*, 235 Ariz. 520, ¶ 31, 334 P.3d 210, 218 (App. 2014); *see also Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

¶8        To establish medical malpractice, a plaintiff must prove negligence by showing that the health care provider fell below the standard of care and that such deviation from the standard of care proximately caused the claimed injury. *Ryan v. San Francisco Peaks Trucking Co.*, 228 Ariz. 42, ¶ 23, 262 P.3d 863, 869-70 (App. 2011). Section 12-563, A.R.S., provides the following as the necessary elements of proof:

> (1) The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.
>
> (2) Such failure was a proximate cause of the injury.

*Id.*; *see also Seisinger v. Siebel*, 220 Ariz. 85, ¶ 32, 203 P.3d 483, 492 (2009). Typically, the standard of care must be established by expert medical testimony. *Ryan*, 228 Ariz. 42, ¶ 23, 262 P.3d at 869-70; *see also Boyce v. Brown*, 51 Ariz. 416, 421, 77 P.2d 455, 457 (1938) (noting established law that "negligence on the part of a physician or surgeon, by reason of his departure from the proper standard of practice, must be established by expert medical testimony" unless negligence grossly apparent). Expert medical testimony is also generally required to establish proximate cause unless a causal relationship is readily apparent to the trier of fact. *Gregg v. Nat'l*

*Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54, 699 P.2d 925, 928 (App. 1985).

**Qualification of Expert Witness**

¶9 The first issue on appeal is whether the Rasors' expert witness, Nurse Ho, was qualified to testify as a standard of care expert pursuant to A.R.S. § 12-2604. The Rasors' medical negligence claim centered on the care provided by NWMC's ICU nurses between July 19 and July 22. Ho opined that NWMC had failed to reposition Rasor during her recovery, proximately causing the pressure ulcer to develop, and failed to order a wound-care consultation and specialty mattress after discovering the pressure ulcer, causing it to worsen. Ho was the Rasors' sole expert as to standard of care, causation, and prognosis. NWMC contends, as it did below in its motion for summary judgment, that while Ho may be an expert on wound care, she is not an ICU nurse and such a nurse is a specialist under § 12-2604. The Rasors respond that Ho's opinions, together with testimony by the ICU nurses, provided sufficient evidence of the standard of care. "Apart from issues of statutory interpretation, which we review de novo, we review trial court determinations on expert qualifications for an abuse of discretion." *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, ¶ 30, 296 P.3d 42, 50 (2013). This standard of review applies to admissibility questions in summary judgment proceedings. *Id.*

¶10 In a medical malpractice action, a health professional may provide expert testimony on the appropriate standard of practice or care only if he or she is licensed and meets the following criteria, in relevant part:

> 1. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is or claims to be a

specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.

2. During the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to . . . the following:

(a) The active clinical practice of the same health profession as the defendant and, if the defendant is or claims to be a specialist, in the same specialty or claimed specialty.

. . . .

3. If the defendant is a general practitioner, the witness has devoted a majority of the witness's professional time in the year preceding the occurrence giving rise to the lawsuit to . . . the following:

(a) Active clinical practice as a general practitioner.

§ 12-2604(A). When the testimony is offered against a health care professional employed by the defendant health care institution, subsection A applies "as if the health professional were the party or defendant against whom or on whose behalf the testimony is offered." § 12-2604(B).

¶11        Section 12-2604(A) applies to medical malpractice cases involving nursing care. *Cornerstone Hosp. of Se. Ariz., L.L.C. v. Marner*, 231 Ariz. 67, ¶ 41, 290 P.3d 460, 472 (App. 2012). In *Marner*, we held that nursing qualifies as a "health profession" for purposes of § 12-2604(A)(2). *Id.*[5] A "'specialty'" pursuant to § 12-2604(A)(2)

---

[5] The Rasors contend *Marner* supports their position that critical-care nursing is not a specialty, asserting the court "declined to distinguish the classifications of RN, LPN and CNA under § 12-

includes specialties and subspecialties. *Baker*, 231 Ariz. 379, ¶ 24, 296 P.3d at 49. The goal of § 12-2604 is to "ensur[e] that experts have qualifications and experience comparable to the [medical professional] whose conduct is at issue." *Id.* As the statute indicates, there must be symmetry as delineated in § 12-2604(A) between the pertinent qualifications and experience of the defendant health care provider and the expert who testifies to the standard of care regarding the care and treatment at issue. *See Baker*, 231 Ariz. 379, ¶ 12, 296 P.3d at 47. Here, Ho is a certified wound-care nurse with specialized education in wound care and ostomy, and worked in that specialty the year before Rasor's injury.

**¶12** NWMC argues that Ho is not qualified to testify as to the standard of care for ICU nurses under § 12-2604 because such nurses fall under their own specialty. The Rasors disagree, asserting that NWMC's ICU nurses had no "additional education or certificate beyond their general RN licenses." They acknowledge however, Ho's contrary opinion that ICU nurses are, in fact, specialists.[6] In

---

2604 . . . [and] primarily relied on the Arizona Administrative Code [(AAC)]." In *Marner*, however, we relied on the AAC chiefly to determine that "the RN is the most qualified of the three [nursing licensures] in terms of education and experience required for certification," in support of our holding that "[i]t would be absurd to conclude that an RN is not qualified to provide expert opinion on the standard of care for professions that require more limited skills than are required of a registered nurse on the ground the RN is overqualified." 231 Ariz. 67, ¶¶ 39-41, 290 P.3d at 471-72. Specialization among RNs, however, was not addressed.

[6] We note that our supreme court has held that the term "specialty" as used in § 12-2604(A)(2) includes practice areas certified as specialties or subspecialties by medical boards or other certifying bodies, as well as those that are eligible for certification. *Baker*, 231 Ariz. 379, ¶¶ 21, 22, 24, 296 P.3d at 49 (determining lower court too narrowly read "'specialty' as embracing only the twenty-four [American Board of Medical Specialties] member boards, thereby excluding a broad range of practice areas certified by these boards as subspecialties or by other certifying bodies"). The Rasors

any event, we need not decide the issue of specialization under § 12-2604(A)(1) because Ho does not meet the criteria of § 12-2604(A)(2) or (3). If the ICU nurses are considered specialists, Ho was not practicing as an ICU nurse for the year prior to Rasor's injury for purposes of § 12-2604(A)(2). And if ICU nurses are instead viewed as generalists, Ho did not work as a generalist the year before Rasor's injury for purposes of § 12-2604(A)(3), but rather as a wound-care specialist.[7] Because Ho was neither an ICU nurse nor a practicing generalist in the year before Rasor's injury, she is not qualified to testify as a standard of care expert for ICU nurses pursuant to § 12-2604(A). *See Preston v. Amadei*, 238 Ariz. 124, ¶¶ 13-14, 357 P.3d 159, 165 (App. 2015) (internist with cardiology practice not qualified to testify to standard of care for internist without such specialty in treating cardiac episode); *see also Woodard v. Custer*, 719 N.W.2d 842, 860 (Mich. 2006) (internal medicine physician with infectious disease practice not qualified to testify regarding standard of care of defendant physician who practiced "general internal medicine").

¶13　　　　The Rasors also assert that "the care at issue concerned the prevention of bed sores, which applied universally to all NW[MC] nurses in all departments; and all restricted in-patients. . . . [and f]or this reason, the specialty requirements set forth in A.R.S. § 12-2604 d[o] not apply." NWMC responds that "it is in the judgment of the ICU nurse in determining how much or how frequently a critically ill patient can be moved and needs to be prioritized if the patient is unstable or repositioning could be

_____

provide no support for their contention that ICU nursing does not qualify as a specialty under § 12-2604 other than asserting NWMC's ICU nurses had no "additional education or certificate," but they do not allege that ICU nurses are ineligible for certification. We take judicial notice that ICU nurses can indeed obtain critical care certification through the American Association of Critical-Care Nurses. *See* http://www.aacn.org/.

[7]Since July 2004, Ho has worked at a long-term, acute-care facility performing admission assessments, re-assessments, and care planning, and the Rasors have not denied her status as a specialist.

detrimental to the patient." And Ho acknowledged that what interventions may be taken depend on the condition of the patient. We therefore reject the Rasors' claim that the hospital's general repositioning policy was the applicable standard of care for the intensive care department.

¶14 The Rasors further contend that "Medicare views the deep tissue injury suffered by [Rasor] as something that should not have occurred with proper nursing care[,] . . . establish[ing] a basis for the jury to conclude that below standard nursing care proximately caused the condition." In support of this proposition, the Rasors provide one record citation, to one of their own filings, which does not include any supporting citation; they provide no legal authority and no argument beyond that quoted above. We therefore deem the issue waived. *See* Ariz. R. Civ. P. 13(a)(7); *Melissa W. v. Dep't of Child Safety*, 238 Ariz. 115, ¶ 9, 357 P.3d 150, 152-53 (2015) (failure to develop argument or cite to relevant authority waives argument on appeal).

¶15 A trial court may properly grant summary judgment on a claim of medical negligence when, as here, the plaintiff fails to produce the required expert testimony concerning the "degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances." § 12–563(1); *see Seisinger*, 220 Ariz. 85, ¶ 33, 203 P.3d at 492 (except when it is a matter of common knowledge, "the standard of care normally must be established by expert medical testimony" and failure to produce the required expert testimony mandates judgment for defendant). Thus, to the extent the trial court found the Rasors' standard of care expert unqualified, it correctly granted NWMC's motion for summary judgment. However, we conclude the court erred by failing to allow the Rasors to secure a new expert, as discussed next.[8]

---

[8] Because NWMC's motion for summary judgment was correctly granted, it is unnecessary to address whether Ho was qualified as an expert under Rule 702, Ariz. R. Evid., and whether she was competent to testify to medical causation or prognosis. And, for the same reason, we need not consider the Rasors'

**Request to Secure New Expert**

**¶16**　　　　The Rasors contend that even if the trial court correctly found Ho unqualified to provide standard of care testimony, the court abused its discretion by denying their request for additional time to secure a new expert. We defer to a trial court's rulings on discovery and related procedural matters absent an abuse of discretion. *See Preston*, 238 Ariz. 124, ¶ 15, 357 P.3d at 165.

**¶17**　　　　When they filed their complaint in July 2013, the Rasors also filed a notice certifying that the action involved a breach of professional duty and "acknowledg[ing] the establishment of standard of care and breach requires expert testimony." The deadline to disclose expert opinions was June 27, 2014. In November 2013, the Rasors disclosed Nurse Ho's preliminary affidavit, providing her expertise as a wound-care specialist and opinion that the NWMC intensive care staff had failed to comply with the applicable standard of care in preventing the wound by "offloading" Rasor, and in caring for the wound by "pressure prevention and treatment." On June 27, they supplemented their disclosure statement as to Ho's expected testimony at trial. Ho was deposed on October 17, 2014 and on October 28, the Rasors filed a motion seeking leave to introduce Ho's testimony "concerning standard of care, causation and prognosis pursuant to evidence Rule 703 and A.R.S. § 12-2604."[9] In November and December 2014, and

---

argument that causation is "readily apparent to a jury, even without expert testimony." *See Ryan*, 228 Ariz. 42, ¶ 23, 262 P.3d at 869-70 (medical malpractice plaintiff must prove negligence by showing health care provider fell below standard of care and such deviation from standard of care proximately caused claimed injury).

　　　　[9]At a hearing on the motion, the trial court noted it had yet to consider the summary judgment motions that had been filed, but stated:

> I am going to grant the motion to introduce [Ho's]
> expert opinion . . . regarding wound care. And then
> as it's applied to how that operates within the context
> of wound care for a person in the ICU, that will come

again in January 2015, the Rasors requested leave to "supplement with additional expert testimony for any areas of deficiency determined by the Court."[10] Simultaneous with its summary judgment ruling, the court, without explanation, denied the Rasors' request for additional time to secure a new expert.

**¶18** Recently, in *Preston*, a case with similar procedural facts, this court concluded the trial court had erred by denying plaintiffs additional time to substitute another standard of care expert. 238 Ariz. 124, ¶¶ 2-7, 19, 357 P.3d at 163-64, 167. We observed that § 12-2603 sets out the requirements for preliminary disclosures of expert opinions in medical malpractice cases and provides "'[u]pon any allegation of insufficiency of the affidavit, the court shall allow any party a reasonable time to cure any affidavit, if necessary.'" *Id.* ¶ 17, *quoting* § 12-2603(F) (alteration in *Preston*). We noted that although the plaintiffs in *Preston* had disclosed their expert's affidavit "well within the discovery period," the defendant "did not raise any direct challenge to the sufficiency of the affidavit, even upon conducting [plaintiffs' expert's] deposition, and instead filed a motion for summary judgment after the disclosure deadline had expired." *Id.* ¶ 19. Likewise, in this case, NWMC did not challenge the sufficiency of the affidavit but, nearly a year after the Rasors filed it and after

out at trial and the jury will evaluate whether or not her wound care expertise is fully responsive to the issues here. . . . [W]ound care is a critical issue of this case. Whether or not it's dispositive of the care that . . . Rasor received will be a question for the jury to determine.

[10]The Rasors included a one sentence request to this effect at the end of their November 2014 reply to NWMC's opposition to introduce Ho's testimony and at the end of their opposition to NWMC's motion for summary judgment. They repeated the request at oral argument on the two summary judgment motions.

the disclosure deadline had expired, deposed the expert and filed its motion for summary judgment.[11]

**¶19**　　　　As noted above, the trial court had granted the Rasors' motion to admit Ho's expert opinion, stating "how that operates within the context of wound care for a person in the ICU, that will come out at trial and the jury will evaluate whether or not her wound care expertise is fully responsive to the issues here." The court additionally said, "I am telling you that I'm going to let you go with a wound care witness rather than an ICU nurse. You can take that to the bank . . . ." Thus, the trial court strongly indicated Ho's opinions would be admitted at trial and it would be left to the jury to assess the credibility and weight to give them. *See Sandretto v. Payson Healthcare Mgmt., Inc.*, 234 Ariz. 351, ¶ 24, 322 P.3d 168, 176 (App. 2014) (noting well-established rule that jury determines credibility and weight afforded to reliable expert testimony). Accordingly, after subsequently granting NWMC's motion for summary judgment, the trial court erred in denying the Rasors additional time to obtain qualifying expert testimony, and we therefore reverse its order so doing.

## Motion for Protective Order

**¶20**　　　　The Rasors next contend the trial court abused its discretion by preventing them from conducting a Rule 30(b)(6), Ariz. R. Civ. P. deposition "to investigate the cause of . . . Rasor's deep tissue injury." In September 2013, the Rasors served a notice of Rule 30(b)(6) deposition requesting that NWMC produce its

---

[11]In its answering brief, NWMC points out that at an April 2014 scheduling conference, its counsel requested the Rasors specify the expert or experts they intended to call to establish standard of care and causation. NWMC did not, however, challenge Ho's qualifications and foundation to testify as an expert witness until its response to the Rasors' motion to introduce Ho's expert testimony in November 2014. NWMC does not address this court's ruling in *Preston* although that decision was filed before NWMC submitted its answering brief and involved the same law firm as represents NWMC in this case.

representative most knowledgeable about, *inter alia*, the cause of Rasor's pressure ulcer and, in October 2013, served an amended notice to the same effect. After corresponding with the Rasors regarding the categories listed in their notices, NWMC filed a motion for protective order.

**¶21** In January 2014, the trial court heard argument by the parties and issued the requested protective order, finding the "request for the deposition is premature" given the early stage of the case and lack of any scheduling order. The following April, the Rasors filed another Rule 30(b)(6) deposition notice seeking information about (1) the first observation of the ulcer, (2) steps taken by NWMC to prevent the development of ulcers, (3) steps taken by NWMC to prevent the worsening of Rasor's ulcer, and (4) staff compliance with record-keeping policies. The court permitted the Rasors to question the representatives to the extent of "policies, procedures and training of the nurses and if the representatives were personally involved in any aspect of [Rasor's] care, that aspect of her care." In May, the Rasors filed yet another Rule 30(b)(6) notice listing seven categories of information, including "[t]he cause of [Rasor]'s decubitus ulcer." The hospital objected to the notice, and the court granted a protective order stating "[t]he [n]otice is outside the areas that have been permitted in this deposition. So [the Rasors] need to provide a notice for a 30(b)(6) deposition that comports to the areas that I indicated were appropriate."

**¶22** "A trial court has broad discretion in ruling on discovery issues, and we will not disturb its ruling absent a clear abuse of discretion." *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, ¶ 41, 144 P.3d 519, 532 (App. 2006). An abuse of discretion occurs if the court commits legal error in reaching a discretionary conclusion, or if the record lacks substantial evidence to support its ruling. *Id.*

**¶23** Rule 30(b)(6) provides for the deposition of an organization when "a party desiring discovery does not know what individual in the responding organization should be called." Ariz. R. Civ. P. 30(b)(6) bar committee note to 1970 Amendment. When noticed, the named organization "designate[s] one or more officers, directors, or managing agents, or other persons who consent to

testify on its behalf" and "[t]he persons so designated . . . testify as to matters known or reasonably available to the organization." Ariz. R. Civ. P. 30(b)(6). At the time of the hearing on the protective order, no scheduling order was in place and discovery was just commencing.[12] The trial court stated:

> I'm going to find that the request for the deposition is premature, and let's get this established so that we have timelines and schedules and there has been some appropriate setting of those limits. . . . [A]t this stage . . . it would not be an effective discovery tool because . . . the defendants [must] be able to determine the necessary people to have available for you and to ensure that they can provide those people who . . . will respond to . . . the level of your inquiry.

As to the grant of the protective order, we cannot say the trial court abused its broad discretion in discovery matters by deeming the Rasors' request for a Rule 30(b)(6) deposition premature when discovery had not yet begun in the case. *See Marquez v. Ortega*, 231 Ariz. 437, ¶ 14, 296 P.3d 100, 104 (App. 2013) ("We do not substitute our discretion for that of the trial court.").

---

[12]In its answering brief, NWMC points out:

> [a]s of the date of the filing of the motion [for protective order], the Rasors had not submitted a preliminary expert opinion affidavit required by A.R.S. § 12-2603 demonstrating that the case ha[d] any merit, had not requested a Rule 16(c)[, Ariz. R. Civ. P.,] pretrial conference, no discovery or pretrial deadlines had been established, and fact witness depositions . . . had not been requested.

¶24        As for the Rasors' noticed April 2014 Rule 30(b)(6) deposition, they do not present any argument on the matter[13] nor do they provide a reference to any responsive motion by NWMC or an accurate record cite to any related ruling by the trial court. The issue is therefore waived. *See State Farm Mut. Auto. Ins. Co. v. Novak*, 167 Ariz. 363, 370, 807 P.2d 531, 538 (App. 1990) (declining to consider matters insufficiently argued and without citation to authority or record). Further, the May 2014 notice exceeded the scope established by the court for the Rule 30(b)(6) deposition, and the Rasors do not appear to have raised the issue of the cause of the ulcer with the court at the hearing or elsewhere.[14] We cannot say the trial court abused its discretion in granting NWMC's motion for protective order relating to the Rasors' May 2014 notice of deposition.

## Cross Appeal

¶25        In its cross appeal, NWMC contends the trial court abused its discretion in ordering it to produce patient records of all ICU patients who had developed pressure ulcers in the four years preceding Rasor's admission. As part of their October 2013 Rule 30(b)(6) notice of deposition, the Rasors had requested that NWMC produce the representative most knowledgeable about "[o]ther incidents of patients developing decubitus ulcer conditions while hospitalized at [NWMC's] facilities," "[r]ecords identifying other incidents of the development of pressure sore ulcer conditions during hospitalization at [NWMC's] facilities from 2001 through 2011[,]" and "[a]ny assessments, evaluations or reports discussing the incidence of pressure sore ulcer conditions in [NWMC's]

---

[13]The Rasors' argument focuses on their inability to question NWMC regarding the cause of the ulcer, a topic not listed in the April 2014 notice of deposition. Although their May 2014 notice of deposition included as a topic, "[t]he cause of [Rasor]'s decubitus ulcer," the court had previously established the boundaries of the deposition.

[14]In their briefs, the Rasors provide no record citation to the May 2014 notice or any other related records.

facilities and/or any discussion concerning reducing the incidence of the conditions."

¶26        In November 2013, NWMC filed its motion for a protective order contending the Rasors' request for information about other patients who had developed pressure ulcers was "overly broad, unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery of any admissible evidence, and would violate peer review/quality assurance processes—not to mention federal HIPAA[15] rules and regulations."   In their response, the Rasors asserted "[t]h[e] discovery is calculated to lead to evidence of habit or routine," citing *Gasiorowski v. Hose*, 182 Ariz. 376, 897 P.2d 678 (App. 1994), and that it

> may lead to discovery of recognition by [NWMC] of certain policies, practices and prevention procedures affecting the assessment of standard of care.  Practices and procedures designed for compliance with standard of care may depend on [NWMC]'s responses to previous claims or incidents of the condition.  Additionally, the positions advanced by [NWMC] in response to decubitus ulcer condition claims may lead to admissible evidence about claims advanced in this case.

After a hearing on the motion for protective order, the trial court implicitly denied the motion but narrowed the permitted discovery, ruling that "[the Rasors] are entitled to discovery of prior similar incidents of patients developing decubitus ulcers while in intensive care" and ordered NWMC to produce all such records "for the four years preceding [Rasor]'s admission to Northwest Medical Center on July 7, 2011."   It later denied NWMC's motion for reconsideration.  In its cross-appeal, the hospital argues the trial

---

[15] Health Insurance Portability and Accountability Act. NWMC has not meaningfully re-urged this specific argument on appeal.

court's order constituted an abuse of discretion because: 1) even with confidential information redacted, the order required disclosure of privileged information; 2) the information was not relevant to the subject matter of the Rasors' lawsuit; and 3) the burden in responding to the order "was extreme." We address these claims in turn.

¶27 Pursuant to Rule 26(b)(1)(A), Ariz. R. Civ. P., unless otherwise limited, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." A trial court has broad discretion over discovery matters, and we will not disturb that discretion absent a showing of abuse. *Blazek v. Superior Court*, 177 Ariz. 535, 537, 869 P.2d 509, 511 (App. 1994). Such abuse occurs when the court misapplies the law or predicates its decision upon irrational bases. *Id.* The existence and scope of an evidentiary privilege is a question of law we review de novo. *See Adv. Cardiac Specialists, Chartered v. Tri-City Cardiology Consultants, P.C.*, 222 Ariz. 383, ¶ 6, 214 P.3d 1024 (App. 2009).

¶28 NWMC first argues the trial court abused its discretion because producing the patient records would require the disclosure of privileged information. Medical records are confidential and receive statutory protection from discovery. *See* A.R.S. §§ 12-2235, 12-2294.01. Notwithstanding these protections, redacted non-party medical records may still be subject to discovery if the records are relevant and certain precautions are taken to protect patient identities. *See Ziegler v. Superior Court*, 134 Ariz. 390, 394-95, 656 P.2d 1251, 1255-56 (App. 1982).

¶29 The Rasors sought evidence of past occurrences of decubitus ulcer conditions, in part, to discover whether there had been "other incidents indicat[ing] a failure of compliance by staff with known repositioning requirements" or "evidence of knowledge on the part of [NWMC] of the need to implement changes." If such incidents had occurred, we cannot say they would be irrelevant to the Rasors' claims, as more fully discussed below. *Cf.* Ariz. R. Evid. 406 (evidence of habit of person or routine practice of organization relevant to prove conduct of that person or organization was in

conformity with habit or routine practice on a particular occasion); *Gasiorowski*, 182 Ariz. at 379, 897 P.2d at 681 (other similar incidents relevant to show defendant physician had habit or routine practice of threading epidural catheters to excessive depth); *Ziegler*, 134 Ariz. at 394, 656 P.2d at 1255 (disclosure of non-party medical records relevant to plaintiff's negligent-supervision claim against hospital to show it had notice of other incidents of physician performing unnecessary procedure). And the trial court ensured sufficient privacy safeguards by ordering NWMC to "redact any confidential patient information from the records produced." *See id.* at 394-95, 656 P.2d at 1255-56. Accordingly, its order did not violate Arizona's statutory physician-patient privilege.

¶30 NWMC contends, however, that its non-party patient records are further privileged under the federal Patient Safety and Quality Improvement Act (hereafter patient safety act), 42 U.S.C. § 299b-21 — 299b-26. That act protects documents, communications, and other information that qualifies as "patient safety work product," 42 U.S.C. § 299b-22, including "any data, reports, records, memoranda, analyses . . . or . . . statements . . . assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization[,] or . . . developed by a patient safety organization for the conduct of patient safety activities." 42 U.S.C. § 299b-21(7)(A). Such information is not subject to discovery in legal proceedings. *See* § 299b-22(a)(2). A "patient safety organization" (PSO) is one certified by the Secretary of the Department of Health and Human Services whose "mission and primary activity. . . [is] to conduct activities . . . to improve patient safety and the quality of health care delivery." 42 U.S.C. §§ 299-21(4), 299-24(a), (b)(1)(A).

¶31 NWMC acknowledges, however, that "medical record[s] . . . or any other original patient or provider record[s]" are expressly excluded from patient safety work product. § 299b-21(7)(B). It nonetheless contends the privilege applies because "identify[ing] specific patients whose records were to be produced" would require the work product "to be accessed." We find this argument unpersuasive.

¶**32**        The act expressly notes that patient safety work product "does not include information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system." § 299b-21(7)(B)(ii). It further elaborates that "[s]uch separate information or a copy thereof reported to a [PSO] shall not by reason of its reporting be considered patient safety work product." *Id.* Clearly, the non-party medical records at issue here were not specifically created for safety or quality control purposes; instead, they were created to diagnose, treat, and/or evaluate a medical condition. Thus, even if identifying the "specific patients whose records were to be produced" requires accessing patient safety work product through the PSO, doing so would not violate the act because the information sought is exempt from protection. *Id.*; *see also* § 299b-22(c)(2)(B) (exempting "nonidentifiable" patient safety work product from confidentiality requirements). And even if the medical records could be regarded as safety work product, the hospital has not met its burden of establishing the medical records were reported to its PSO as required by the Act. *See* § 299b-21(7)(A) (for record "assembled or developed" by a provider to a PSO to qualify as patient safety work product, it must actually be reported to the PSO). Although NWMC provided the name of its PSO and claims it duly submitted the patient records at issue, it offered no proof to support the latter assertion. We conclude the patient safety act is inapplicable.

¶**33**        NWMC next argues the medical records were not relevant and the trial court's reliance on *Purcell v. Zimbelman*, 18 Ariz. App. 75, 500 P.2d 335 (1972) was "misplaced" because "knowledge of a danger was not an issue in the case." In its ruling ordering NWMC to produce the medical records, the trial court quoted *Purcell*, stating:

> In a negligence case, where knowledge of a danger is an issue, "evidence of the occurrence of other accidents or injuries from the doing of a particular act or the employment of a particular method on occasions prior to the one in question is admissible to show that the person charged

> knew or should have known of the danger therein, provided it is shown that the conditions of the previous occurrences were the same or substantially similar to those of the one in question."

18 Ariz. App. at 83, 500 P.2d at 343. NWMC apparently interprets the "danger" in the court's ruling to mean the potential danger that a patient may develop pressure ulcers, as well as the harm they can cause. And it correctly notes that the hospital has never claimed to have been unaware of the potential danger of pressure ulcers and that the Rasors acknowledge NWMC "recognized th[e] risk [of pressure ulcers]" and had procedures in place to prevent them.

¶34 To the extent the trial court's ruling on NWMC's motion for a protective order was predicated on the mistaken assumption that "knowledge of a danger" was in dispute, it erred in allowing discovery of prior similar incidents on that basis. The Rasors, however, as previously noted, argued that the requested discovery would be relevant to proving NWMC's staff had a habit or routine of not following the hospital's repositioning procedures. *See* Ariz. R. Evid. 406. We will affirm a trial court's decision if legally correct for any reason. *See Forszt v. Rodriguez*, 212 Ariz. 263, ¶ 9, 130 P.3d 538, 540 (App. 2006).

¶35 Evidence of a person's habit or the routine practice of an organization may be admitted to prove that the person or organization on a particular occasion "acted in accordance" with the habit or routine practice. Ariz. R. Evid. 406. Habit is a regular response to a repeated specific situation. *See Gasiorowski*, 182 Ariz. at 379, 897 P.2d at 681. In *Gasiorowski*, this court held that the trial court erred in excluding evidence of other similar incidents to prove the defendant physician's alleged habit or "general pattern" of failing to observe the standard of care, noting that "[e]vidence is relevant and probative if it has any tendency to make any fact of consequence more or less probable." *Id.* at 380, 897 P.2d at 682. We reasoned that "[j]ust as Rule 406 supported [defendant's] introduction of routine practice evidence to attempt to establish his habitual compliance with the standard of care, it also supported plaintiff's attempt to establish through the observations of delivery

room nurses that [defendant] had a routine practice of threading epidural catheters to excessive depth." *Id.*

¶36         We emphasize that the issue here, unlike in *Gasiorowski*, is not relevance for admissibility at trial, but whether the standard for pretrial discovery of the medical records is met. *See Catrone v. Miles*, 215 Ariz. 446, ¶ 25, 160 P.3d 1204, 1212 (App. 2007). Thus, we assess the relevancy requirement more broadly than we would when evaluating admissibility. *Brown v. Superior Court*, 137 Ariz. 327, 332, 670 P.2d 725, 730 (1983) (relevancy requirement at discovery stage "more loosely construed than that required at trial" and need only be "reasonably calculated to lead to the discovery of admissible evidence"). In so doing, we conclude the medical records the Rasors sought were reasonably calculated to lead to the discovery of admissible evidence that the ICU nurses who had treated Rasor had a habit or routine practice of failing to follow ICU repositioning requirements. *See* Ariz. R. Civ. P. 26(b)(1); *Catrone*, 215 Ariz. 446, ¶ 25, 160 P.3d at 1213-14. Accordingly, we will not disturb the trial court's discovery ruling on this basis.

¶37         Finally, NWMC contends the trial court's order was "overly broad and unduly burdensome" because it would require the hospital to review four years of "voluminous" patient records "to identify patients in the ICU." NWMC presented this argument below, and the court afforded it the opportunity to submit an affidavit providing specific reasons as to why it "[w]ouldn't be able to generate that [information]." NWMC failed to supply such an affidavit. In light of this, it has not demonstrated the request was unduly burdensome. *See* Ariz. R. Civ. P. 26(b)(1)(B) (party seeking non-disclosure because of "undue burden or expense" must first show information not reasonably accessible).

**Disposition**

¶38         For the foregoing reasons, the trial court's January 2014 ruling on the Rasors' Rule 30(b)(6) deposition and its May 2014 ruling permitting the Rasors discovery regarding other NWMC ICU patients are affirmed, but its denial of the Rasors' request for additional time to secure a new expert witness is reversed, its

judgment in favor of NWMC is vacated, and the case is remanded for further proceedings consistent with this decision.