ESPINOSA, Judge:
¶ 1 In January 2015, the trial court entered summary judgment in favor of Northwest Medical Center (Northwest or the hospital) in the medical malpractice action filed by Karyn Rasor and her husband (the Rasors). They appealed, and in an opinion filed on May 17, 2016, we concluded the Rasors' proffered expert witness was unqualified to give standard-of-care testimony; however, we reversed the trial court's denial of the Rasors' request for additional time to secure a new expert and vacated its summary judgment order. Rasor v. Nw. Hosp., LLC (Rasor I ), 239 Ariz. 546, ¶¶ 15, 38, 373 P.3d 563 (App. 2016).
¶ 2 Upon review, our supreme court agreed that the Rasors' expert did not qualify as a standard-of-care expert but remanded the case to us to determine two additional issues: whether the expert was qualified to testify to causation, or if expert testimony on causation was not required. Rasor v. Nw. Hosp., LLC (Rasor II ), 243 Ariz. 160, ¶¶ 3, 29, 32-33, 403 P.3d 572 (2017). We conclude the case does call for expert causation testimony and although the Rasors' expert witness was not qualified on the standard of care, she was competent to testify about causation. We therefore remand to the trial court to provide the Rasors an opportunity to file a motion to obtain additional evidence pursuant to Rule 56(d), Ariz. R. Civ. P., and for any other appropriate proceedings.[1]
Factual and Procedural Background
¶ 3 On appeal from summary judgment, we view the facts in the light most favorable to the party against whom summary judgment was entered. See Wilson v. Playa de Serrano , 211 Ariz. 511, ¶ 2, 123 P.3d 1148 (App. 2005). The underlying facts describing Karyn's critical care hospitalization at Northwest are detailed in Rasor I , 239 Ariz. 546, ¶¶ 2-4, 373 P.3d 563. For present purposes, we note that in July 2011, Karyn underwent open-heart surgery at Northwest, after which she received an intra-aortic balloon pump (IABP) threaded through her femoral artery and requiring the immobilization of her leg. Following surgery, Karyn spent several days in the intensive care unit (ICU), where the nurses eventually discovered a pressure ulcer on her coccyx that ultimately reached "stage IV" and required thirty-one debridement procedures.
¶ 4 Based on Karyn's allegedly permanent pain and other symptoms, the Rasors brought a medical malpractice action against Northwest in July 2013, alleging the hospital had "breached its professional duties ..., proximately causing the development of a decubitus ulcer" by failing to "appropriately off-load" Karyn and "negligently fail[ing] to timely discover" the ulcer during her intensive care. In support of their claim, the Rasors *958 retained a single expert, a board-certified wound-care nurse, Julie Ho, R.N. In Ho's opinion, Northwest had not adequately repositioned Karyn during recovery, causing the development of a pressure ulcer, which worsened because of the hospital's failure to respond appropriately after discovering it. The Rasors filed a motion to qualify Ho as an expert on the standard of care, causation, and prognosis, or, in the alternative, to be permitted to identify a new expert.
¶ 5 Northwest subsequently filed a motion for summary judgment, asserting that Nurse Ho "d[id] not qualify under Arizona Rule of Evidence, Rule 702, A.R.S. § 12-2603, and A.R.S. § 12-2604" to render opinions in this matter such that the Rasors "[we]re unable to establish that [the hospital] breached the applicable standard of care and [the] Complaint should be dismissed." At the hearing on the Rasors' motion, the trial court found that Ho could testify to the standard of care and stated, "I'm going to let you go with a wound care witness rather than an ICU nurse. You can take that to the bank, okay?" However, the court also said, "[W]hat I'm concerned about is whether or not she could testify as to causation," ultimately concluding that the Rasors could introduce her expert opinion "regarding wound care."
¶ 6 At the oral argument on Northwest's summary judgment motion, the Rasors again asked that they be permitted to find a new expert witness if the trial court determined that Nurse Ho was unqualified. The court, however, denied that request and granted summary judgment without explanation.[2] The Rasors appealed, and as noted above, we concluded that Ho was unqualified as a standard-of-care expert. Our supreme court agreed, but remanded the case for this court to determine whether Ho might nevertheless be qualified to provide expert testimony on causation, or whether this case does not require a causation expert as a matter of law. See Rasor II , 243 Ariz. 160, ¶¶ 8, 29, 32, 403 P.3d 572. On remand, we ordered supplemental briefing on "the requisite qualifications for causation experts in medical malpractice cases under Arizona law," and the parties filed simultaneous briefs.
Causation Expert Witnesses
¶ 7 Before addressing whether Nurse Ho was qualified to testify to causation in this case, we must determine whether the Rasors needed to provide a causation expert at all. See id. ¶¶ 32-33. " '[U]nless a causal relationship is readily apparent to the trier of fact,' expert medical testimony normally is required to establish proximate cause in a medical negligence case." Salica v. Tucson Heart Hosp.-Carondelet, L.L.C. , 224 Ariz. 414, ¶ 16, 231 P.3d 946 (App. 2010), quoting Gregg v. Nat'l Med. Health Care Servs., Inc. , 145 Ariz. 51, 54, 699 P.2d 925, 928 (App. 1985) (alteration in Salica ). In their opening brief before this court, the Rasors asserted "the nature of the risk from the failure to relieve pressure over Ms. Rasor's tailbone and the ensuing injury there provides the kind of evidence of causal relationship that is readily apparent to a jury, even without expert testimony." We disagree.
¶ 8 The Rasors' generalized contention is undercut by another section of their opening brief that quoted an explanation of "the mechanism of injury" from the hospital's disclosure statement:
Pressure over a bony prominence causes tissue ischemia in the skin, muscle, and the fascia between the skin surface and bone. The pressure compresses small vessels and prevents both supply of oxygen and nutrients at the capillary interface as well as venous return of metabolic wastes. Metabolic wastes accumulate and cause local vasodilatation, which contributes to edema, which further compresses small vessels and increases edema and ischemia. Local tissue death then occurs, resulting in a pressure ulcer.
The record also includes testimony from the hospital's expert regarding numerous factors contributing to development of a pressure ulcer, which he stated in Karyn's case went beyond her being "critically ill in the ICU, on vasopressors, with decreased circulation" and "the intubation with mechanical ventilation *959 and an intra-aortic balloon pump" making her "difficult to mobilize in bed." He went on to identify as "additional risk factors" that Karyn was "hypoalbuminemic," "mildly anemic," "a smoker," and had "two collagen vascular disorders, rheumatoid arthritis and systemic lupus erythematosus," both of which were "pro-inflammatory conditions" that would contribute to other risk factors for development of pressure ulcers.
¶ 9 We cannot conclude a jury would find the process of developing a pressure ulcer and attendant contributing factors, particularly in Karyn's case, as well as the resulting existence or lack of a causal relationship "readily apparent." Accordingly, this case requires expert testimony regarding causation. Cf. Frausto v. Yakima HMA, LLC , 188 Wash.2d 227, 393 P.3d 776, ¶ 8 & n.2 (2017) (concluding expert causation testimony was required given process responsible for causing bedsores ).
¶ 10 We next turn to the issue of expert qualifications. "Apart from issues of statutory interpretation, which we review de novo, we review trial court determinations on expert qualifications for an abuse of discretion," applying this standard of review "equally ... to admissibility questions in summary judgment proceedings." Baker v. Univ. Physicians Healthcare , 231 Ariz. 379, ¶ 30, 296 P.3d 42 (2013). Expert witness testimony in general is governed by Rule 702, Ariz. R. Evid., which allows the testimony if the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and the testimony meets certain other requirements. "In a medical malpractice case, the plaintiff must prove negligence by presenting evidence that the healthcare provider(s) fell below the standard of care and that these deviations from the standard of care proximately caused the claimed injury." Ryan v. S.F. Peaks Trucking Co. , 228 Ariz. 42, ¶ 23, 262 P.3d 863 (App. 2011).
¶ 11 As it did below, the hospital primarily relies on the fact that the Rasors' proffered witness was a nurse, and not a doctor, to argue she was unqualified to testify as a causation expert. Specifically, Northwest asserts, "Given the complex pre-existing conditions that Ms. Rasor had, along with her complex medical problems, surgery and post-surgical complications, conditions and interventions, it is beyond the scope of a nurse to render a medical causation opinion," particularly "in this case where Ms. Ho admitted that the development of a pressure ulcer is multifactorial and depends on the patient's co-morbidities and conditions-areas which she did not even consider." In the hospital's supplemental brief, it requests that we "state a bright line rule that a nurse cannot offer causation opinions in a medical malpractice action."
¶ 12 Section 12-2603(A), A.R.S., governs expert testimony in medical malpractice cases and requires the filing of an affidavit stating "whether or not expert opinion testimony is necessary to prove the health care professional's standard of care or liability for the claim." If such affidavit asserts the need for expert testimony, claimants must then file a "preliminary expert opinion affidavit" including "[t]he expert's qualifications to express an opinion on the health care professional's standard of care or liability for the claim." § 12-2603(B)(1). Section 12-2603(H)(2) defines an expert in the same terms as Rule 702 : " 'Expert' means a person who is qualified by knowledge, skill, experience, training or education to express an opinion regarding a licensed health care professional's standard of care or liability for the claim."
¶ 13 Our supreme court has previously noted that "[t]he overall purpose of Rule 702... is simply to ensure that a fact-finder is presented with reliable and relevant evidence." State v. Bernstein , 237 Ariz. 226, ¶ 14, 349 P.3d 200 (2015), quoting State v. Langill , 157 N.H. 77, 945 A.2d 1, 10 (2008) (first alteration added, second alteration in Bernstein ). In addition, we have observed that § 12-2603 aims to "curb frivolous medical malpractice lawsuits by imposing a stricter standard of pleading and setting deadlines for the early involvement of the plaintiff's expert witnesses." Passmore v. McCarver , 242 Ariz. 288, ¶ 9, 395 P.3d 297 (App. 2017), quoting Gorney v. Meaney , 214 Ariz. 226, ¶ 8, 150 P.3d 799 (App. 2007). Indeed, the Arizona legislature, in enacting § 12-2603, expressly declared its purpose "to curtail the filing of *960 frivolous lawsuits against health care professionals." 2004 Ariz. Sess. Laws, ch. 4, § 2 (adding § 12-2602.01, subsequently renumbered § 12-2603 ). Notably, however, the statute does not impose stricter requirements on experts in medical malpractice cases and instead appears to accomplish its purpose through the imposition of the expert affidavit procedure. See § 12-2603.
¶ 14 But for standard-of-care experts in such cases, A.R.S. § 12-2604(A) imposes additional criteria that must be met for the expert to testify. Section 12-2604(A) specifically limits its application to "expert testimony on the appropriate standard of practice or care." But no corresponding statute or rule imposes additional requirements on causation experts in medical malpractice cases. See State v. Christian , 205 Ariz. 64, ¶ 6, 66 P.3d 1241 (2003) ("[T]he best and most reliable index of a statute's meaning is the plain text of the statute."); cf. Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin. , 206 Ariz. 1, ¶ 22, 75 P.3d 91 (2003) ("Neither the statute's plain language nor its intent contemplates that such a narrow, bright line distinction be drawn between what is an emergency condition and what is not."). Nor is there Arizona precedent holding medical malpractice causation experts to a higher standard than those in other cases, as there has been for standard-of-care experts dating back even before the adoption of Rule 702. Cf. Seisinger v. Siebel , 220 Ariz. 85, ¶¶ 33-35, 203 P.3d 483 (2009) (discussing history of requirements for standard-of-care experts in medical malpractice cases). As the hospital acknowledges in its supplemental brief, given this backdrop and the fact that § 12-2603(H)(2) defines "Expert" in the same terms as Rule 702, "[t]he qualifications for a causation expert in a medical malpractice case in Arizona are those that apply to all testifying experts pursuant to Rule 702."
¶ 15 The issue still remains whether a nurse, and Nurse Ho in particular, is qualified to testify regarding causation. At the outset, we reject the hospital's request for a bright line rule prohibiting nurses from testifying as causation experts in medical malpractice cases. As noted above, through § 12-2604, the legislature expressly created stricter criteria for standard-of-care experts in such cases than for other experts, including those testifying to causation. As our supreme court recognized in Seisinger , quoting from our decision in that case on appeal, § 12-2604"precludes a witness who is otherwise qualified under Rule 702 from testifying [to the standard of care] in a medical malpractice case unless he or she meets the additional criteria set forth in the statute." 220 Ariz. 85, ¶ 18, 203 P.3d 483. Northwest has identified no Arizona authority, nor are we aware of any, imposing a blanket prohibition upon nurses testifying as standard-of-care experts. Were we to create such a prohibition in medical malpractice cases, we would impose stricter requirements for causation experts under Rule 702 than exist for standard-of-care experts under § 12-2604, counter to the implicit legislative intent. The legislature not having done so, neither will we. Cf. Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n , 220 Ariz. 587, ¶ 20, 208 P.3d 676 (2009) (courts defer to legislative enactments in part because legislature far better equipped than judiciary to evaluate data bearing upon legislative questions).
¶ 16 Our conclusion also comports with those of several other jurisdictions. See Frausto , 393 P.3d 776, ¶¶ 16, 28-29 & n.5 (permitting nurses as causation experts in medical malpractice cases and identifying eight states doing the same, plus an additional six, including Arizona, with case law arguably permitting it); see also, e.g. , Williams v. Eight Jud. Dist. Ct. , 127 Nev. 518, 262 P.3d 360, 365-67 (2011) (rejecting argument nurses can never testify as to medical causation and holding nurses "may obtain the requisite skill, knowledge, or experience to testify as to cause"); Diggs v. Novant Health, Inc. , 177 N.C.App. 290, 628 S.E.2d 851, 855-56 (2006) (same). In Frausto , the Washington Supreme Court noted that certain jurisdictions holding to the contrary "rely on provisions within their state's statutory frameworks prohibiting nurses from making medical diagnoses" and contrasted Washington's framework allowing advanced registered nurse practitioners "to practice independently and make diagnoses within the limited scope of their certification." 393 P.3d 776, ¶¶ 1, 16.
*961 ¶ 17 Northwest seeks to distinguish Frausto on the basis that the proffered expert there was a nurse practitioner while this case involves a nurse, asserting, "A nurse does not have the education, nor is a nurse allowed by law to make a medical diagnosis. A nurse cannot diagnose or treat any medical condition." Section 32-1601(23)(a), A.R.S., however, provides, " 'Registered nursing' includes ... [d]iagnosing and treating human responses to actual or potential health problems." Section 32-1601(23)(d) additionally allows a registered nurse to "[e]stablish[ ] a nursing diagnosis," which Ariz. Admin. Code R4-19-101 defines as "a clinical judgment, based on analysis of comprehensive assessment data, about a client's response to actual and potential health problems or life processes. Nursing diagnosis statements include the actual or potential problem, etiology or risk factors, and defining characteristics, if any." Moreover, "etiology" means "[t]he branch of medicine that deals with the causes or origins of disease" or "[t]he cause or origin of a disease or disorder as determined by medical diagnosis." The American Heritage Dictionary 611 (5th ed. 2011).
¶ 18 To the extent there is a distinction between the "diagnosing" that nurses are permitted to do under Arizona law and a "medical diagnosis," we find it a distinction without a difference as it pertains to the threshold question of whether nurses in general may give causation testimony in medical malpractice cases. Like Washington's supreme court, we conclude that "[a] sweeping ban on causation testimony from expert [nurses] is unnecessary and inconsistent with" the authority granted to them under Arizona statutes and the Arizona Administrative Code. Frausto , 393 P.3d 776, ¶ 29. Thus Rule 702 remains the test for whether Ho was qualified to give expert testimony as to causation in this case.
¶ 19 Rule 702 provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.
In the context of this rule, our supreme court has stated, "The test of whether a person is an expert is whether a jury can receive help on a particular subject from the witness. The degree of qualification goes to the weight given the testimony, not its admissibility." Seisinger , 220 Ariz. 85, ¶ 16, 203 P.3d 483, quoting State v. Davolt , 207 Ariz. 191, ¶ 70, 84 P.3d 456 (2004). Moreover, the rule "must be interpreted and applied with some flexibility to encompass the multitude of scenarios that may be presented and to maintain the division in function between the fact-finder and [the judge as] gatekeeper." Bernstein , 237 Ariz. 226, ¶ 14, 349 P.3d 200, quoting Langill , 945 A.2d at 10. And, "[i]n close cases, the trial court should allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the weight and credibility of evidence." Id. ¶ 18. "Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Ariz. R. Evid. 702 cmt. to 2012 amend.
¶ 20 In this case, when the Rasors identified Nurse Ho as an expert witness they intended to call at trial, she was a registered and certified wound-care nurse, then working as a director of wound care at a long-term, acute-care hospital. During Ho's deposition, she stated that her role at that hospital included "admission assessments," "weekly re-assessments," and "care planning," and she "provided treatments and collaborat[ed] with physicians[ and others] for the plan and care for the patients." Additionally, although she was then working in a long-term, acute-care hospital, she had spent the first nine years of her career in a coronary care unit of an acute-care hospital like Northwest, was cross-trained for the ICU, *962 and had gained experience working with patients recovering from open-heart surgery.
¶ 21 According to the Rasors' disclosure, Nurse Ho had reviewed Karyn's medical records, the hospital's policies for preventing pressure ulcers, and information from the nurses regarding their interaction with Karyn. The Rasors proffered that Ho would testify Northwest "should have relieved the pressure created over Ms. Rasor's coccyx by repositioning her correctly and utilizing a specialty pressure relieving surface" and "[h]ad Northwest Hospital properly provided these standard interventions, the deep tissue injury should have been avoided." Ho would also testify that after one of the nurses observed "bruising over the coccyx," she should have "[a]t a minimum" "attempt[ed] to remove all pressure which caused the deep tissue injury" and the "failure to intervene likely le[ ]d to a worsening of the injury, which ultimately ended in a stage IV decubitus ulcer open to the coccyx bone."[3]
¶ 22 During Nurse Ho's deposition, the hospital elicited her testimony that she did not "intend to give an opinion with regard to any predisposing or premorbid conditions that Ms. Rasor had with respect to the development of the pressure ulcer" and had not been given access to Karyn's entire medical chart for the time she was at Northwest. Additionally, although Ho stated that her opinion was "to a reasonable degree of medical probability," "relying on best practice[s] and research," she also stated she was not making a medical diagnosis as to causation but rather "an assessment" because "[a] pressure ulcer is not a medical diagnosis."
¶ 23 On appeal, Northwest points to these portions of Nurse Ho's testimony and argues "her opinions are not based on sufficient facts or data, the product of reliable principles and methods, and principles and methods reliably applied to the facts of this case" and "she disqualif[ied] herself based on her testimony." Initially, we disagree with the hospital's conclusion that Ho disqualified herself by stating she was making "an assessment" of causation rather than a medical diagnosis of causation. Northwest has identified no authority, nor are we aware of any, for the proposition that testimony on the causation of injuries must be a "medical diagnosis" as opposed to "an assessment." As we concluded in Lohmeier v. Hammer , "under Arizona law, it is not necessary that an expert witness be a medical doctor in order to offer testimony regarding the causation of physical injuries so long as ... the expert has specialized knowledge that will assist the jury in its resolution of that issue." 214 Ariz. 57, ¶ 28, 148 P.3d 101 (App. 2006).
¶ 24 As for the hospital's argument that Nurse Ho's opinion is not sufficiently well-founded, we note that in both its answering and its supplemental brief, Northwest falls back on its assertion that a nurse is not qualified to give causation expert testimony, a premise we have already rejected. Additionally, although the hospital may question the foundation and strength of Ho's opinion given that she did not review Karyn's complete medical records, that issue goes to the weight of her testimony and is not sufficient to render the opinion so unreliable as to preclude it altogether. See Bernstein , 237 Ariz. 226, ¶ 18, 349 P.3d 200 ("Whether errors in application [of methodology] render evidence unreliable will not always be clear. In close cases, the trial court should allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the weight and credibility of evidence."). The hospital's concerns that Ho did not consider enough of the factual record in the case and that her "opinion seems to be that because Ms. Rasor developed a pressure ulcer, the ICU nurses must have been negligent" are appropriate subjects for cross-examination by Northwest and restriction by the trial court should Ho venture into the impermissible realm of offering legal conclusions. See id. ("[A]s long as an expert's scientific testimony rests upon good grounds, ... it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors'
*963 scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."), quoting Langill , 945 A.2d at 11 (first alteration in Bernstein , second alteration in Langill ).
Conclusion
¶ 25 As our supreme court has observed, under Rule 702, "[f]or a witness to be qualified as an expert, he or she need only possess 'skill and knowledge superior to that of [people] in general.' " State v. Romero , 239 Ariz. 6, ¶ 17, 365 P.3d 358 (2016), quoting State v. Girdler , 138 Ariz. 482, 490, 675 P.2d 1301 (1983) (first alteration added, second alteration in Romero ). As previously noted, Nurse Ho was both a certified wound-care nurse and a registered nurse, whom Arizona empowers to "[e]stablish[ ] a nursing diagnosis," § 32-1601(23)(d), which includes determining the "etiology" or cause of a disorder, Ariz. Admin. Code R4-19-101. She had been a registered nurse for more than twenty years and a hospital director of wound care since 2013. Certainly, she possessed greater knowledge and skill than the average layperson, and we conclude she was "qualified as an expert by knowledge, skill, experience, training, or education," Ariz. R. Evid. 702, to testify as a causation expert in this case.
Disposition
¶ 26 For the foregoing reasons, summary judgment is vacated and the case is remanded to the trial court for the Rasors to seek Rule 56(d) relief and for any other proceedings consistent with this opinion.

Our supreme court specifically directed that should we determine summary judgment was inappropriate on causation, on remand to the trial court, the Rasors should be provided an opportunity to use Rule 56(d) to seek to obtain a qualified standard-of-care expert. See Rasor II , 243 Ariz. 160, ¶ 33, 403 P.3d 572. It is for the trial court in the first instance to resolve any Rule 56(d) motion filed in this case.

Rule 56(a), Ariz. R. Civ. P., directs that trial courts "should state on the record the reasons for granting or denying" a motion for summary judgment.

To the extent that Nurse Ho's proposed testimony may blend causation and standard of care, the parties and trial court are not prevented from addressing the issue and, if necessary, restricting it to the former by way of further proceedings, such as a motion in limine and/or limiting instruction.